No. 44,423

LAIRD & COMPANY, a corporation, and 34 other corporations, *Appellees*, v. J. R. CHENEY, Director of Alcoholic Beverage Control; EVERETT STEERMAN, ROBERT F. GALLOWAY and ALFRED WILLIAMS, Members of the Alcoholic Beverage Control Board of Review; ROBERT C. LONDERHOLM, Attorney General of the State of Kansas, *Appellants*.

(414 P. 2d 18)

Opinion filed May 7, 1966.

*Park McGee*, Assistant Attorney General, argued the cause, and *Robert C. Londerholm*, Attorney General, and *Thomas B. Root*, of Topeka, were with him on the brief for the appellants.

*Harry W. Colmery*, of Topeka, argued the cause, and *Robert E. Russell* and *Gerald J. Letourneau*, both of Topeka, were with him on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: At issue here is the constitutionality of certain enactments of the 1961 Kansas legislative session, now appearing as K. S. A. 41-1111 to 41-1121, and particularly K. S. A. 41-1112, relative to price control of liquor sold by manufacturers or suppliers to licensed distributors.

Brief discussion of a portion of our liquor law will be helpful in understanding the issues involved. When the legislature in 1949, in implementation of the newly adopted amendment of article 15, section 10, of the Kansas constitution, enacted laws legalizing the liquor industry, it recognized, for our purposes here, three levels of business enterprise therein, namely, (1) manufacturers or distillers or their marketing subsidiaries or distributors of alcoholic liquor bottled in a foreign country (hereinafter referred to as suppliers),

(2) distributors, and (3) retailers, with licenses being required for the latter two categories and for the resident manufacturer.

In an effort to avoid certain evils associated with the liquor traffic, it determined that, unlike many other states, there would be no authorization for exclusive distributorships and no discrimination in prices from suppliers to distributors and from distributors to retailers. This was accomplished through the adoption of that which, as now amended, appears as K. S. A. 41-1101. Subsection (1) thereof provides that it shall be unlawful for a distributor to purchase alcoholic liquor from a supplier unless the supplier shall have filed with the state director of alcoholic beverage control (hereinafter referred to as the director) a written sworn statement wherein he agrees he will sell his brands or kinds of liquor to any licensed distributor in the state at the same current price and without discrimination. The supplier is to file with the director as often as may be required but at least quarterly a list of current prices of his particular liquors to be offered. This subsection further provides that if any supplier violates his agreement by refusing to sell to any licensed distributor or by discriminating in current prices then the director shall notify all licensed distributors in this state of such violation, whereupon it becomes unlawful for the distributors to purchase liquor from such supplier and the license of any distributor making such purchase shall be revoked. Thus it is seen that instead of licensing the out-of-state suppliers the state has chosen to exert control over them by authorizing distributors to purchase only from such suppliers who are willing to comply with our price regulations. Subsection (2) contains similar provisions governing prices from distributors to retailers. Other sections of the liquor control act have the effect of completely divorcing retail sales of liquor from manufacturing and wholesaling (see, *State, ex rel., v. Kansas Retail Liquor Dealers Foundation, Inc.,* 192 Kan. 293, 387 P. 2d 171).

A further step in legislative control of liquor price was taken with the enactment of Laws 1959, Chapter 217, which purported to authorize the director to fix minimum prices for sales of liquor by distributors to retailers and for sales by retailers to consumers, based on suggested price lists therefor filed by the supplier. This act was held unconstitutional upon the basis it contained two unauthorized delegations of the lawmaking power (*State, ex rel., v. Mermis,* 187 Kan. 611, 358 P. 2d 936).

Thereafter the 1961 legislature enacted the provisions now under attack (Laws 1961, Chap. 241), section 1 of which (now K. S. A. 41-1111) expresses policy as follows:

"In the public interest and in order to promote the orderly sale and distribution of alcoholic liquor, to foster temperance and to promote the public welfare, in the state of Kansas, the legislature finds: (*a*) That sales prices of alcoholic liquor sold by manufacturers and others to distributors licensed in this state should be no higher than the lowest price for which the same is sold to distributors anywhere in the continental United States; and (*b*) that minimum sale prices for alcoholic liquor sold by distributors and retailers licensed in this state should be determined and regulated by law."

Section 2 (K. S. A. 41-1112), the chief subject of this controversy, provides as follows:

"The prices filed by manufacturers and others authorized to sell alcoholic liquors to licensed distributors, pursuant to subsection (1) of section 41-1101 of the General Statutes Supplement of 1959, shall be the current prices, F. O. B. point of shipment, and said price as filed by each manufacturer or vendor shall be as low as the lowest price for which the item is sold anywhere in any state in the continental United States by such manufacturer or vendor: *Provided,* That in determining the lowest price for which an item of alcoholic liquor is sold in any such state there shall be taken into consideration all advertising, depletion and promotional allowances and rebates of every kind whatsoever made to purchasers in such state by the vendor."

Sections 3 to 7 (K. S. A. 41-1113 to 41-1117) provide for the fixing by the state alcoholic beverage control board of review of minimum sale prices for sales from distributors to retailers and from retailers to consumers. Sections 8 and 9 (K. S. A. 41-1118 and 41-1119) provide for the promulgation of rules and regulations necessary to carry out the provisions of the enactment. Section 10 (K. S. A. 41-1120) states legislative intent to make the act a part of our liquor control act, and finally, section 11 (K. S. A. 41-1121) provides that any person violating any provisions of the act shall be guilty of a misdemeanor and upon conviction punished as provided by law.

On May 19, 1961, the director issued a memorandum requesting suppliers to file price lists for a three-month period commencing August 1, 1961, in accordance with the new enactment. On June 14, 1961, eighteen out-of-state suppliers, part of the appellees herein, filed this action for declaratory judgment and injunctive relief against enforcement of the act, and at the same time obtained a temporary order restraining enforcement of the act. Thereafter this order was modified to restrain only the requirement of price filings

by suppliers under 41-1112 and the enforcement of criminal sanctions under 41-1121. On July 14, 1961, appellants, the enforcing officers, filed an answer denying allegations of unconstitutionality. Thereafter appellants sought unsuccessfully to have the temporary restraining order vacated. Meanwhile seventeen more suppliers were permitted to become party plaintiffs in the action and to avail themselves of the temporary restraining order. Trial to the court was had December 9, 10 and 11, 1963. Appellees offered into evidence testimony in the form of depositions of officers of five appellee corporations and of a marketing consultant to the liquor industry as to the anticipated effect of the new law, along with certain exhibits concerning the liquor industry. Appellants offered in evidence copies of sworn written statements of forty-two suppliers filed with the director pursuant to 41-1112. The matter was taken under advisement and on June 27, 1964, the trial court entered its final decision, making extensive findings upholding appellees' contentions and concluding that 41-1112 is an unlawful regulation of interstate commerce by the state of Kansas in violation of the federal constitution; that the statute is arbitrary, unreasonable and capricious and in violation of the due process and equal protection clauses of the fourteenth amendment to the federal constitution and of sections 1 and 18 of the bill of rights of the Kansas constitution; that sections 41-1111 through 41-1121 violate article 2, section 16, of the Kansas constitution and are therefore void. Appellants have appealed from the judgment rendered accordingly.

Federal constitutional questions will be considered first. Appellees assert the law violates the due process and equal protection clauses of the fourteenth amendment and the interstate commerce clause, and the trial court so ruled.

In *State v. Payne*, 183 Kan. 396, 327 P. 2d 1071, this court rejected similarly grounded attacks on a statute making possession of liquor upon which Kansas revenue had not been paid a criminal offense saying:

"Pursuant to the 21st Amendment to the Constitution of the United States a state may absolutely prohibit the manufacture, transportation, importation, sale or possession of alcoholic liquors irrespective of when or where produced or obtained, or the use to which they are to be put, and may adopt measures reasonably appropriate to effectuate those inhibitions and exercise full police power in respect to them, unfettered by the due process clause, the equal protection clause or the commerce clause. This greater power to prohibit includes the lesser power to permit under definitely prescribed conditions." (Syl. ¶ 6.)

These general principles were recently reaffirmed in *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P. 2d 864.

Appellees recognize the principles asserted in this line of cases but state they are to be limited to situations wherein the state control sought to be exerted is wholly local in effect and are not applicable where that control is made to extend into other states, citing federal decisions other than those cited in the *Payne* case, among which are *Hostetter v. Idlewild Liquor Corp.,* 377 U. S. 324, 12 L. ed. 2d 350, 84 S. Ct. 1293, and *Dept. of Revenue v. James Beam Co.,* 377 U. S. 341, 12 L. ed. 2d 362, 84 S. Ct. 1247.

Appellees point particularly to the proviso part of section 2—that all advertising, depletion and promotion allowances of every kind whatsoever made to purchasers of liquor in other states shall be taken into consideration in determining the lowest price for which an item of liquor is sold in any state—and argue that the effect is the placing of an undue burden on the conduct of their business in other states. They contend these types of allowances are made in other states in consideration of certain merchandising practices beneficial to the suppliers, which are prohibited in Kansas; therefore because of the proviso, they must give the Kansas distributor "something for nothing," which loss to the supplier must be absorbed in the operations in some other states.

Appellees further argue that before attempting to meet and solve any merchandising problem in another state they are forced to consider what effect any price reduction there will have in Kansas; also, that if they are forced to grant a certain price to Kansas distributors by reason of the proviso and for which they receive no consideration, distributors in other states will expect the same preferred treatment; and they contend once having posted a price in Kansas they are required to maintain that price elsewhere for a period of ninety days or face prosecution in Kansas, and, in effect, Kansas will be setting the price of liquor in every state or the suppliers would be compelled to give up legal marketing practices in other states.

At the very least, these ingenious contentions, based on appellees' largely self-serving declarations, are speculative and conjectural as to what extraterritorial effect the law may have in the future and we think, therefore, without merit. Moreover, since this case has been submitted to this court they have been answered unfavorably to appellees by the Supreme Court of the United

States. In 1964 the state of New York enacted an alcoholic beverage control law containing provisions substantially the same as those under attack here (Chapter 531, 1964 Session Laws of New York). That law requires the monthly filing of price schedules by suppliers for liquor sales to distributors accompanied by an affirmation that the filed price is no higher than the lowest price at which sales were made anywhere in the United States during the preceding month. It also contains a price computation proviso similar to our own to the effect that in determining such lowest price all discounts, rebates, free goods, allowances and other inducements of any kind given to the distributor shall be reflected. Sixty-two suppliers attacked this law. The law successfully ran the gauntlet in the New York courts against the same challenges asserted here. (*Joseph E. Seagram & Sons, Inc. v. Hostetter*, 45 Misc. 2d 956, 258 N. Y. S. 2d 442; affirmed 23 App. Div. 2d 933, 259 N. Y. S. 2d 644; affirmed 16 N. Y. 2d 47, 209 N. E. 2d 701, 262 N. Y. S. 2d 75) and finally, on April 19, 1966, its validity was upheld by the Supreme Court of the United States (*Joseph E. Seagram & Sons, Inc. v. Hostetter*, ____ U. S. ____, 16 L. ed. 2d 336, 86 S. Ct. 1254). Specifically the latter court held that under the twenty-first amendment the particular method of regulation chosen was valid on its face, the enforcement thereof having been stayed throughout the litigation, and that it does not unconstitutionally burden interstate commerce or contravene the due process or equal protection clauses of the fourteenth amendment. On the commerce aspect, which is the point principally urged here, the court reiterated its previous position that "'a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders.'" (p. ____.)

Before passing to other complaints against the act we should consider appellees' evidence as to its claimed effect upon their operations. Appellees sell liquor in both open license states and monopoly states. The former are those in which the liquor business is operated as a private enterprise under state regulation through a licensing system. Monopoly states are those in which the state engages in the business of buying and selling liquor. Sales to monopoly states are in larger quantity, there being but one distributor (the state) involved, and are therefore at lower prices per unit than where there are many distributors each buying smaller

quantities. Appellees, corporations of varying size and complexity of national organization, who furnish about ninety-two percent of the liquor imported into Kansas, emphasize the highly competitive nature of their business, each competing intensely within given price ranges for consumer acceptance of his particular brands. The goal, as in any merchandising effort, is a broad horizontal base of acceptance over a wide area, extending into many or all of the fifty states, with new areas of operations being sought. In striving for this the suppliers are faced with many varied local factors, illustrative of which are competition with locally produced liquors, area and ethnic tastes or traditional preferences for particular kinds of liquor (as distinguished from brands) which results in higher volume sales of that particular kind, different methods of distribution, advertising and sales practices allowed by law in the particular area and varying marketing conditions which never remain fixed and constant. There are others. In their efforts the suppliers are, in the language of one of the appellees' witnesses "using all of the ingenuity at our disposal within the laws of each state to promote our brands and these efforts take various forms." Concessions in price are made in order to introduce new brands. Merchandising techniques are adapted to meet local conditions. The ultimate objective of all merchandising being to get the product into the hands of the consumer, suppliers use all possible incentives and promotion devices which are aimed at the distributors, who are the key to success in moving the particular product and getting it eventually to the consumer. Suppliers would prefer a single distributor within a state for economy of operations. In some state all advertising therein on behalf of a supplier may be done by an exclusive distributor. Sales to Kansas distributors are necessarily in small quantities because of the requirement for sales to all distributors desiring to purchase. The use of incentives and allowances to distributors is a normal business practice in most of the other states. Through them the suppliers claim to "buy" the services of the distributors in moving their particular product but this is forbidden in Kansas. Suppliers who operate nationally have been forced to decentralize their business operations so that they may be able to react quickly to price changes in a particular area and remain competitive there. Managerial responsibility for price-fixing as well as for accounting is delegated to an area or regional level below a national headquarters with the result that both prices and

costs are not known at the top level of management until some time later. Constant readjustment is required. It is not always possible to compute quickly and accurately the cost of a product nationally or in a given state because of the difficulty in allocating promotion costs incurred to meet specific local problems in marketing and it is difficult if not impossible to tie certain costs to certain brands. Many of the price changes suppliers make in a particular area are only temporary in nature because conditions are constantly changing. In determining their "current prices, F. O. B. point of shipment" the factors would be total cost of original production, warehousing, bottling and preparation for market, federal and state excise taxes and a fair margin of profit to the supplier, fixed with an ultimate price in mind which would insure the greatest degree of acceptability by the consuming public.

Appellees contend, with respect to our Kansas constitution, first, that section 2 being made a criminal statute which does not require a criminal intent in doing the proscribed act, violates section 1, 10 and 18 of our bill of rights by being vague and indefinite in its terms. As previously indicated, section 11 makes a violation of the act a misdemeanor punishable as provided by law.

Appellees urge vagueness in many respects. They profess doubt as to what states are meant by the requirement that the price filed shall be as low as the lowest price for which the item is *sold in any state*. They assert that where monopoly states are involved they do not make sales *in* the states but rather they sell *to* those states. We think the lawmakers intended no such distinction and we cannot accord any such in interpreting the statute. Its plain words include sales in every state where liquor is furnished by suppliers, regardless of the character of the initial buyer. This conclusion is further compelled by reference to the policy statement in K. S. A. 41-1111 (*a*) wherein the legislature finds sales prices in this state should be "no higher than the lowest price for which the same is sold to distributors anywhere in the continental United States." In monopoly states the state is the distributor. Appellees profess not to know whether to take into consideration prices at which they sell in the District of Columbia. The answer here seems to lie in K. S. A. 77-201, *Fifteenth*, wherein for purposes of statutory construction the term "state" is made to include the district. Appellees say they are not in doubt as to what are their "current prices, F. O. B. point of shipment" but they are uncertain as to what price is required to be

filed by reason of the fact the price so filed is to remain constant and fixed for a period of ninety days and they express fear of criminal prosecution in filing an improper price because of later price changes in other states. We think appellees are unduly apprehensive as to the possible effect of the law. Certainly it does not require clairvoyance in the filing of prices nor does it impose the impossible, and appellees' liability to criminal prosecution would not depend on their ability to predict future prices success-fully. The law requires filing of *current* prices. *Current* is defined in Webster's Third New International Dictionary, Unabridged, as follows:

". . . presently elapsing . . . occurring in or belonging to the present time . . . in evidence or in operation at the time actually elapsing . . . most recent. . . ." (p. 557.)

We think the law contemplates no more than the periodic filing of a current price as the term is commonly understood, that is, a price based upon the latest available experience at the time of computation. Subsequent events would be irrelevant to that par-ticular filing, and the fact that the price is to be filed in advance of its taking effect and that it then remains firm for a period of time would not render later price changes in other states revelant to the validity or propriety of the previously posted price.

Appellees indicate uncertainty as to the meaning of the phrase used in the proviso in section 2 that in determining the lowest price certain kinds of allowances made to purchasers "shall be taken into consideration." However one chooses to state it, the entire section deals with the subject of a *maximum* price to be filed, that is, one as low as the lowest. The proviso is concerned only with a determination of that lowest price and not with any other degree of price. Keeping in mind the object of the statute, we think legislative intent is plain, and that what is clearly meant by the phrase in question is that all such allowances made to pur-chasers, being diminishing factors of the amount actually received by the sellers, are to be deducted, and reflected accordingly, in determining that lowest price.

Appellees complain that the terms "advertising," "depletion," "promotional" and "rebates of every kind" are not defined in the statute and they are therefore uncertain as to their meaning. This contention is not borne out by appellees' testimony wherein it ap-pears that these terms are very meaningful in the liquor industry.

For example, the term "depletion allowance" was described several times as one made to the distributor in consideration of his sale to retailers within a limited time period of a certain amount of liquor already purchased by the distributor. It is a form of incentive designed to "push" the distributor in moving the particular merchandise further on in the channels of commerce. All that is meant by the terms in question is that any such allowances which are paid to the distributor and which in fact lower his price shall be reflected in the price posted in Kansas.

· The degree of definiteness which a criminal statute must contain in order to meet the minimum requirements of constitutional due process has been indicated in *State v. Ashton,* 175 Kan. 164, 262 P. 2d 123, where this court said:

"'A criminal statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application, lacks the first essential of due process of law.'" (Syl. ¶ 1.)

On the same subject, in *United States v. National Dairy Corp.,* 372 U. S. 29, 9 L. ed. 2d 561, 83 S. Ct. 594 (1963), we find this:

"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." (pp. 32, 33.)

Measured by these standards, and without further laboring the matter, we think the statute provides a reasonably definite mandate so that anyone reading it can understand what is required and what conduct is proscribed; hence the statute is not unconstitutionally vague and indefinite. In reaching this conclusion we are not unmindful of our holding in *State, ex rel., v. Fleming Co.,* 184 Kan. 674, 339 P. 2d 12. Suffice it to say, the vagueness found there does not exist in the statute under consideration. The legislature here has set clear standards for determining the price to be filed. In further support of our holding we note from the record that forty-one suppliers of liquor in Kansas, other than appellees, as well as one of the appellees, have in fact filed price lists of their brands in *prima facie* compliance with section 2 and the law is being administered as to them.

Appellees contend section 2 is an arbitrary, unreasonable and capricious exercise of the police power and that it deprives them of their property without due process of law in violation of sections 1 and 18 of our bill of rights. While recognizing the broad police power existent in liquor control, they assert that the methods

adopted are unreasonable and arbitrary and bear no real and sub-
stantial relation to any legitimate object sought to be obtained. In
support of this they argue that the section is in the nature of a
price-fixing scheme which tends to lower the price of liquor thereby
promoting intemperance. They say there is no reason why Kansas
should have the benefit of lower prices existent in some other state
because of marketing or local conditions which do not prevail in
Kansas. In other states promotion practices are permitted whereby
they are in effect permitted to "buy" the distributors' services in
"pushing" their particular product, which practices are forbidden
in Kansas. The Kansas distributor cannot and does not give any-
thing of value to the supplier; therefore he should be paid nothing.
Likewise, exclusive distributorships are permitted in other states or
the state is the sole buyer, resulting in high volume sales, which
volume price is made available in Kansas by section 2.

Underlying appellees' complaint is the fact that certain features
of our law are different from that in many other states. Kansas law
permits very little in the way of stimulation of liquor sales. Aggres-
sive merchandising practices are simply not allowed. Vendors at
any level do not have the right to sell liquor in Kansas through the
same methods of merchandising used in the sale of soap, tooth-
paste or a like commodity. Any tendency toward monopoly
through the use of exclusive franchises is forbidden. In Kansas it
has long been recognized that alcoholic liquor "occupies a different
status before the courts and the legislatures from other kinds of
property" (*State v. Durein,* 70 Kan. 13, 80 Pac. 987) and the legis-
lative power to regulate it is broader than the power to regulate
ordinary business (*Tri-State Hotel Co. v. Londerholm,* 195 Kan.
748, 408 P. 2d 864).

As heretofore set forth, legislative policy sought to be effectuated
in the instant enactment was expressed that in the public interest
and welfare, and to promote temperance and the orderly sale of
liquor, it should be sold as outlined in the statute, and that mini-
mum prices for distributors and retailers should be determined and
regulated. And as we have seen, other sections of the law do fix
standards for establishing prices to be charged for liquor sold by
distributors to retailers and by retailers to consumers (K. S. A. 41-
1113 to 41-1117). The starting point or base for the determination
of the distributor's price to retailers is the "acquisition costs" to the
distributor, being his "case price" paid for liquor. This would be
the same as the posted "current prices, F. O. B. point of shipment,"

686

prescribed in section 2. Keeping in mind the fact that a price based on "point of shipment" (either the place of manufacture or of ware-housing) would be the same for all shipments regardless of destination, we see nothing wrong with the requirement that the Kansas price should be as low as that for any other state, the price else-where being largely within the control of the supplier. The pro-viso so bitterly attacked simply means that such price shall be the amount actually realized by the seller on the transaction instead of an initial "invoice price" which may or may not be the true price to the distributor. (See *Joseph E. Seagram & Sons, Inc. v. Hostetter,* _____ U. S. _____, 16 L. ed. 2d 336, 86 S. Ct. 1254, footnote 19.) The legislature thus has declared in section 2 what the distributor's "acquisition costs" shall be, to which, in determining his price to the retailer, are to be added taxes, selling costs, cost of trans-portation from the "F. O. B. shipping point," any legitimate, reason-able expense incurred in the conduct of the business, and a reasonable markup or profit for the distributor (K. S. A. 41-1116). The same statute makes similar provision for minimum prices for sales by retailers to consumers. Thus we see section 2 is not simply a price-fixing device for the benefit of Kansas distributors but it is an integral part of a comprehensive law governing price structure at all levels. Section 2 simply provides for a maximum price upon which are to be based minimum prices pre-scribed by other sections, thereby causing that maximum price to distributors to be reflected ultimately in the price to the con-sumers. Maintenance of price stability has long been considered to be in the interest of temperance and the prevention of chaos in the liquor traffic. This has been justified on the basis that un-limited competition resulting in price-cutting and price wars leads to greater consumption of liquor as well as upon the theory that dealers faced with ruinous competition may resort to illegal sales in order to sustain themselves. If these matters be debatable, the proper forum for resolving the debate is the legislative hall (see *State, ex rel., v. Sage Stores* Co., 157 Kan. 404, 141 P. 2d 655). We note from the record that in at least some of the monopoly states the suppliers must warrant that their prices are no higher than those charged in other states. Hence, the requirement appears to be not too unusual. We think then the method used is reasonable and not arbitrary and that there is a real and substantial relation to a proper legislative purpose expressed in the act (the orderly sale of

liquor) and no constitutional inhibition appears. The fact that the measure used has the effect of controlling prices does not deprive it of its essentially regulatory character. We do not sustain the act as a purely price control measure but as a police regulation asserting control over the liquor industry wherein section 2 is an integral part of an overall price structure for the entire industry. The fact that there may be some difficulty in complying with the act and even economic hardship as a result would have no bearing on its constitutionality (see *California Auto. Assn. v. Maloney*, 341 U. S. 105, 95 L. ed. 788, 71 S. Ct. 601).

We examine finally the contention that the act in question amends K. S. A. 41-1101 (1) and is therefore void because it does not conform to article 2, section 16, of the Kansas constitution, which insofar as pertinent provides:

". . . no law shall be . . . amended, unless the new act contain the entire . . . section or sections amended, and the section or sections so amended shall be repealed."

This limitation has been held not to apply to amendments by implication or to independent acts which only incidentally restrict existing legislation (*Kimminau v. Common School District*, 170 Kan. 124, 223 P. 2d 689) or to legislation which is purely supplemental in character (*Ellis v. Kroger Grocery Co.*, 159 Kan. 213, 152 P. 2d 860). Counsel have cited many decisions of this court on this subject, and the lines are not always easily drawn therein as to whether there is amendment and repeal on the one hand or supplemental or independent legislation with resultant repeal by implication on the other. In arriving at a proper answer it may be well to keep in mind the purpose of the limitation, expressed in *State, ex rel., v. Rural High-School District*, 126 Kan. 166, 267 Pac. 2, as follows:

" 'The mischief designed to be remedied by the constitutional provision cited was the enactment of amendatory statutes in terms so blind that the legislators themselves were sometimes deceived in regard to their effect; and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws.' " (p. 169.)

At 82 C. J. S., Statutes, § 260 c., p. 428, we find this:

"Constitutional provisions requiring the setting forth of the statute as amended have never, in construction, been given a rigid effect, but have been held applicable only to such statutes as come within their terms, when construed according to the spirit of such restrictions, and in the light of the evils to be suppressed. They should receive a reasonable and liberal construction, with the view of upholding the acts of the legislature, and not unnecessarily hampering or embarrassing it in its work. . . ."

Applying these principles to the case at bar, we cannot say that section 2 (41-1112) unconstitutionally amends 41-1101. The latter provides for the filing of lists of current prices. No effort was made to classify prices by degree or otherwise; no reference was made to a particular price and nothing was said about any "as low as the lowest." Experience with this previous law undoubtedly revealed the desirability of adding something to it; that was what was done by section 2 without changing existing 41-1101. Section 2 recites first the substance of the requirement for a filing of prices by suppliers, then elaborates as to what those prices shall be. The section is complete within itself and wholly intelligible on its face as to just what is meant. We do not think the legislators acted blindly or that they or the public were deceived by the terms of section 2. 41-1101 was not changed or modified; it is still operative and in full force and effect, as it was before the 1961 enactment supplementing it.

Upon the record before us we find no federal or state constitutional infirmity in K. S. A. 41-1111 through 41-1121. Therefore the judgment of the trial court is reversed.

APPROVED BY THE COURT.

FROMME, J., not participating.