No. 51,428

COLBY DISTRIBUTING CO., INC., *et al., Appellees,* v. MICHAEL
LENNEN, *et al., Appellants.*

(606 P.2d 102)

Opinion filed January 19, 1980.

*Robert E. Duncan, II,* assistant attorney general, argued the cause and *Alan F. Alderson,* general counsel, *John P. Quinlin* and *David A. Wright,* all of the Kansas Department of Revenue, were with him on the brief for the appellants.

*Terry G. Paup,* of Wichita, and *James W. Sargent,* of Sargent, Klenda, Haag & Mitchell, of Wichita, argued the cause and *Donald Patterson,* of Fisher, Patterson, Sayler & Smith, of Topeka, was with them on the brief for the appellees Grant-Billingsley Wholesale Liquor Co., *et al.*

*Robert C. Foulston,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause and was on the brief for the intervenor Standard Liquor Corporation.

*Payne H. Ratner, Jr.,* of Ratner, Mattox, Ratner, Barnes & Kinch, P.A., of Topeka, argued the cause and *Jim J. Marquez,* of Topeka, was with him on the brief for the intervenor Kansas Retail Liquor Dealers Association.

*Reid F. Holbrook,* of Steineger & Holbrook, P.A., of Kansas City, argued the cause and was on the brief for intervenors Sunflower Sales of Topeka, A-B Sales Co., Inc. and Eastern Distributing Co., Inc.

*Patrick L. Connolly,* assistant district attorney, argued the cause and *Vern Miller,* district attorney, and *Stuart W. Gribble,* assistant district attorney, were with him on the brief for the intervenor State of Kansas, *ex rel.* Vern Miller.

The opinion of the court was delivered by

HERD, J.: This is an action seeking a declaratory judgment and permanent injunction from the enforcement of 1979 amendments to the Kansas Liquor Control Act (K.S.A. 41-101 *et seq.*). The amendments were enacted by the legislature, effective May 10, 1979 and are designated House Bill 2020. The trial court found the act constitutional but found certain sections of the amendments in violation of the Sherman Anti-Trust Act. 15 U.S.C. § 1 *et seq.* We hold H.B. 2020 constitutional, thus reversing in part and affirming in part the judgment of the trial court.

A brief discussion of the history of Kansas liquor laws will be helpful in understanding the issues before us. In 1880, Kansas amended its constitution providing for prohibition. Kan. Const. art. 15, § 10. Bootleggers and illegal saloons flourished, however, until Carry Nation and others aroused public indignation by their attacks on illegal liquor traffic at the turn of the century. Feelings of both anti-saloon and pro-saloon forces became increasingly violent until finally, urged on by the fear of armed conflict, the legislature passed laws making it a penal offense for one to give another a drink of alcoholic liquor, to be found in a place where it was sold, to sell it and finally to possess alcoholic liquor. L. 1881, ch. 128, §§ 2, 10. The latter was known as the "bone-dry law."

Ultimately in 1948, the citizens of Kansas recognized prohibition neither ended liquor consumption nor eliminated its sale. The constitution was amended to permit the legal sale of liquor. L. 1947, ch. 248, § 1. As a result the Kansas Liquor Control Act (K.S.A. 41-101 *et seq.*) was passed in 1949 ending 69 years of constitutional prohibition. It provided for the regulation of the manufacture, distribution, sale, possession and consumption of alcoholic liquors. The act has remained virtually unchanged except for the 1965 Private Club Act (K.S.A. 41-2601 *et seq.*) and the 1978 Restaurant Club Act (K.S.A. 1978 Supp. 41-2601 *et seq.* and K.S.A. 1978 Supp. 41-803). It provides for a three-tiered distribution system composed of a manufacturer, distributor and retailer, none of whom may own any interest in the other and all are licensed by the state.

The original law required that alcoholic liquor be sold subject to the provisions of the Kansas Fair Trade Act (G.S. 1949, 50-301 - 50-310) which effectively established a minimum price. *The Fair Trade Act* was declared unconstitutional and void, in violation of

Art. 2, § 1 of the Constitution of Kansas, in 1958. *Quality Oil Co. v. du Pont & Co.,* 182 Kan. 488, 322 P.2d 731 (1958). During the 1959 legislative session, a liquor price control act was enacted which governed the sale price of alcoholic liquors. In 1961 it was found unconstitutional by this court on the grounds it was an unauthorized delegation of legislative authority to private persons without guidelines. *State, ex rel., v. Mermis,* 187 Kan. 611, 358 P.2d 936 (1961).

Immediately following that decision, the legislature enacted the liquor price control law (K.S.A. 41-1111 — 41-1121) which remained effective until H.B. 2020 went into effect. It provided that the pricing began with the manufacturer who must sell to the distributor at a price "as low as the lowest price for which the item is sold anywhere in any state in the continental United States . . . ." K.S.A. 41-1112. This is known as a price affirmation law. It should be noted the legislature delegated the authority to fix the beginning price on liquor to the manufacturer from prices determined by competition. This arrangement was held valid in *Laird & Company v. Cheney,* 196 Kan. 675, 414 P.2d 18 (1966).

After the manufacturer established the beginning price and had it affirmed, the Alcoholic Beverage Control Board of Review (ABC) established a reasonable markup for the distributor and retailer taking into consideration all business costs and a reasonable profit. Each distributor was authorized to sell any brand of liquor anywhere in the state to any retailer. This system is known as "open franchising." In addition, it prohibited retailers from purchasing from a manufacturer and having him send invoices to distributors who in turn would bill the retailer with the goods sent directly from manufacturer to retailer. Kansas requires the liquor be shipped exclusively to the distributor's warehouse. This is known as an "at rest" law. Kansas law also requires distributors to purchase liquor only from brand owners or manufacturers, or their exclusive agents. This purchase arrangement has been categorized as a "primary source" law. An excellent discussion of the historical and economic background of alcoholic liquor in Kansas is found in an unpublished article, "The Status of Alcoholic Liquor in the State of Kansas: A Progress Report," written by William T. Terrell, Associate Professor of Economics at Wichita State University.

Reflecting constituent complaints on pricing and ABC complaints of illegal retail purchases out of state, the 1978 legislature created a Special Committee on Liquor Laws to conduct a study seeking remedies for the complaints. H.B. 2020 was the result of the Committee's study.

Briefly, H.B. 2020 is an attempt to obtain liquor prices which are competitive with surrounding states by introducing competition into the three-tiered structure. The affirmation technique at the manufacturer level was retained but at the distributor level, H.B. 2020 permits the distributor to negotiate brand franchise contracts for a territory statewide area or less, and allows the price to seek its own level in the market place as a result of competition between brands. The wholesale price established by the competition plus a reasonable markup determined by the ABC Board then becomes the retailer's minimum price to the consumer. The distributor must respect the franchise territory he has acquired and may not sell outside that area. There were nine licensed liquor distributors in Kansas at the time of trial: Standard Liquor Corporation; Grant-Billingsley Fruit Co., d/b/a Grant-Billingsley Wholesale Liquor Co., Inc.; Colby Distributing Co., Inc.; Kansas Distributors, Inc.; Eastern Distributing, Inc.; A-B Sales, Inc.; Sunflower Sales Co.; Famous Companies, Inc.; and D. A. Winters Co., a sole proprietorship. Neither Famous nor Winters are parties or intervenors in this suit. Colby sold its business to Standard during the pendency of the appeal. The Wholesale Dealer's Association supported the passage of H.B. 2020; however, after its enactment, in the scramble for brand franchises, Colby, Grant-Billingsley, and Kansas Distributors were unsuccessful in obtaining the brands or area they sought. Standard and Famous each obtained statewide franchises on numerous popular brands of liquor. A-B Sales, Sunflower and Eastern Distributing were satisfied with their franchises, although the areas are less than statewide and are for fewer brands than Standard and Famous. The franchise alignment resulted in at least two wholesale competitors for all types of alcoholic liquor in every area of the state.

H.B. 2020 became effective May 10, 1979, but provided all distributors would have 120 days thereafter to dispose of the accumulated inventories of liquor brands for which they had not obtained a franchise. This action was filed July 17, 1979, by Kansas Distributors, Colby and Grant-Billingsley, against the

secretary of revenue, director of alcoholic beverage control and members of the Alcoholic Beverage Control Board of Review. At that time, the trial court entered a temporary restraining order preventing implementation of H.B. 2020 until August 31, 1979.

On August 3, 1979, Standard, A-B Sales, Sunflower and Eastern were permitted to intervene in opposition to plaintiff's position; Vern Miller, Sedgwick County District Attorney, and The Kansas Retail Liquor Dealers Association intervened in support of the plaintiffs. It was never clarified by the parties why the district attorney of Sedgwick county was permitted to intervene on behalf of the people of Kansas in opposition to the attorney general.

The case was tried August 6 and 7, 1979. Plaintiff's evidence consisted of the testimony of John F. Grant, president of Grant-Billingsley Wholesale Liquor Co. and Albert C. Becker, president of Kansas Distributors, Inc., both of whom testified they did not oppose H.B. 2020 until they discovered they could not obtain the brand franchises or the territory they had anticipated. They stated Standard and Famous each held statewide franchises on a number of well known brands of wines and distilled spirits representing 32.33% and 31.83%, respectively of the total brands sold. They introduced documents showing the specific brands each had negotiated with suppliers. Both witnesses admitted plaintiffs had mutually agreed Colby would take the western Kansas territory, Grant-Billingsley central Kansas, and Kansas Distributors, Inc. eastern Kansas. Each would have the same brands, altogether constituting a statewide franchise. They further testified that as a result of Famous and Standard obtaining statewide franchises on so many popular brands, their projected volume would be reduced by two-thirds and they would be driven out of business.

Plaintiff's one other witness was William T. Terrell, a Wichita State University economist who had made a study of the Kansas Liquor Control Act. He testified in his opinion the exclusive franchise provisions of H.B. 2020 would create a wholesale liquor monopoly. He also stated, however, that under the law prior to H.B. 2020, Kansas was more of a control or monopoly state than a license state.

Defendants called Sen. Frank Gaines who testified the legislature intended to maintain the three-tiered liquor control system in Kansas and passed H.B. 2020 as an exercise of the police power to

lower prices to the consumer, maintain an orderly market and eliminate the importation of illegal liquor from out of state, thereby collecting more taxes within the state.

The defendants also called Leslie J. Rudd, president of Standard Liquor Corporation. He testified there would be brand competition under H.B. 2020 because of the proprietory or economic interest each distributor had in his franchised brands. That interest would create a savings in freight costs, a reduction in warehouse inventory and a more efficient operation, all resulting in a savings to the consumer. He also testified the prices he had filed with the ABC for September were below the prices for the same brands previously filed under the old law.

The challenge to the bill's constitutionality generally centers around the sections dealing with exclusive franchising and price fixing by distributors. The sections under attack are too lengthy to include in this opinion. We have therefore, included the trial court's brief summation of the pertinent sections of H.B. 2020.

"a. Sec. 2 allows distributors to sell only such brands of alcoholic liquor to only those retailers whose licensed premises are located within the geographic territory for which such distributor is authorized to sell such brand as designated in the notice or notices filed with the Director pursuant to Sec. 3;

"b. Sec. 3 prohibits any distributor from selling any alcoholic liquor in this state unless such distributor has filed with the Director a written notice stating each geographic territory as has been agreed upon between such distributor and a distiller within which such distributor shall sell to retailers one or more brands of such distiller. Said section further provides that no distiller shall grant such a franchise for the distribution of a brand to more than one distributor for all or part of any designated territory. Said section likewise proscribes and limits in sub-sections (3), (4), (5) and (6) the ability of any such distiller or such distributor to terminate or modify any such franchise or to alter the geographic territory designated in such franchise agreement, except for reasonable cause;

"c. Sec. 4 prohibits any distributor of alcoholic liquor from selling a brand or kind of such liquor to any retailer whose licensed premises are located outside said distributor's exclusive franchise territory for such brand as established under Sec. 3 described hereinabove. Sec. 4 further prohibits any distiller or distributor from fixing, maintaining, coercing or controlling the resale price of such alcoholic liquor to be resold by such distributor or distiller, but specifically authorizes distributors to furnish licensed retailers with a price list of the retail minimum price, including the minimum mark-up, for all such liquor sold by such distributors to such retailers;

"d. Sec. 5 prohibits any distributor of alcoholic liquor from purchasing any such liquor from any distiller unless such distiller shall file with the

Director a written statement agreeing to sell any of the brands or kinds of such liquor manufactured and distributed by such distiller to any distributor licensed in this state and having a franchise to distribute such brands of such liquor, pursuant to Sec. 3, and to make such sales to all franchised distributors at the same current price and without discrimination and to file periodic price lists showing their current prices with the office of the Director. Sec. 5 further prohibits any licensed retailer from purchasing any such liquor from any such distributor unless such distributor shall file with the Director a written statement agreeing to sell any of the brands or kinds of such liquor distributed by such distributor and to provide service in connection therewith to any licensed retailer whose licensed premises are located within the geographic territory of such distributor's franchise for such liquor, to make such sales to all such licensed retailers at the same current bottle and case price, and without discrimination and to file price lists showing such current bottle and case price in the office of the Director periodically;

"e.  Sec. 6 specifically provides that the sales price of alcoholic liquor sold by distiller to licensed distributors of alcoholic liquor shall be no higher than the lowest price for which same is sold to distributors anywhere in the continental United States, and that the minimum mark-ups of such liquor to be sold by retailers licensed in this state should be determined and regulated by the ABC Board and thereby eliminates from any regulation whatsoever the price at which such liquor can be sold by distributors to retailers and the minimum price at which such liquor can be sold by retailers to consumers.

"f.  Sec. 7, Sec. 8, Sec. 9 and Sec. 10 deal with the establishment of ABC Board of minimum mark-up which shall be charged by retailers in sales of alcoholic liquor to consumers;

"g.  New Sec. 11 provides for a period of 120 days or until September 10, 1979, wherein a presently licensed distributor, such as the Plaintiffs herein, may sell any alcoholic liquors that such distributor may have on hand at the time this Act takes effect in the same manner, and to the same purchasers as such distributor was authorized to sell the same prior to May 10, 1979."

Section 14 is the amending and repealing portion of the bill. The trial court rendered its decision on August 31, 1979. It found:

"4.  The state has the right to establish and regulate franchise areas under the police power to regulate the liquor industry so long as these laws do not interfere or impede valid federal law or constitutional safeguards. Providing for suppliers and distributors to establish exclusive franchise areas without state intervention or state power to control or regulate has no reasonable rational relation to the purpose of fostering temperance and orderly marketing conditions. The effect of the exclusive franchise system authorizes private persons to engage in anti-competitive conduct and constitutes a violation of the Sherman Act.

"5.  It is even more pernicious to allow price fixing with an exclusive franchise to sell, both controlled by the same non-government entity, without regulation by the state.

.  .  .  .

"Therefore, the following sections are declared void in accordance with these findings, conclusions and decisions:

    a.   Section 7
    b.   Section 8
    c.   Section 9
    d.   Section 10

"12.  The following sections are valid except as follows:

    a.  New Section 3(1) - Delete 'No manufacturers, importer or other supplier shall grant a franchise for the distribution of a brand to more than one distributor for all or part of any designated territory.'

    b.  Section 6 - Delete 'and (b) that minimum mark-ups on alcoholic liquor sold by retailers licensed in this state should be determined and regulated by law.'

    c.  Section 10(2) - Delete 'plus minimum mark-up.'

All other sections are valid."

A permanent injunction was granted with the judgment barring implementation and enforcement of the invalid portions of H.B. 2020.

On September 5, 1979, the trial court denied defendants' application for an injunction pending an appeal, which enabled the defendants and the ABC Board to continue operating under the prior law, but stayed the judgment until September 10, 1979. Defendants perfected their appeal and on September 10 requested a stay of H.B. 2020 and the trial court's judgment pending the appeal. This court stayed the trial court's order but refused to stay H.B. 2020 which became effective that day.

The plaintiffs cross-appealed on September 17, 1979, placing all of the issues raised by the pleadings and the judgment of the trial court before this court, challenging the constitutionality of H.B. 2020.

For purposes of clarity, we will hereafter refer to the plaintiffs as appellees and the defendants as appellants. We will begin our discussion by reviewing several well established rules pertaining to legislative enactments.

"It is fundamental that our state constitution limits rather than confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby. [Citations omitted.]

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. [Citations omitted.]

"In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [Citations omitted.]

"Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. [Citations omitted.]

"Courts do not strike down legislative enactments on the mere ground they fail to conform with a strictly legalistic definition or technically correct interpretation of constitutional provisions. The test is rather whether the legislation conforms with the common understanding of the masses at the time they adopted such provisions and the presumption is in favor of the natural and popular meaning in which the words were understood by the adopters. [Citations omitted.]" *State ex rel. Schneider v. Kennedy,* 225 Kan. 13, 20-21, 587 P.2d 844 (1978).

*City of Baxter Springs v. Bryant,* 226 Kan. 383, 598 P.2d 1051 (1979).

As a result of the stays granted in this litigation, in addition to the legislative 120-day delay postponing the effective date of the act (new Section 11, H.B. 2020), the provisions of H.B. 2020 were not in effect on the date of trial, rendering the evidence presented highly speculative. Our concern here is primarily with the constitutionality of the provisions of H.B. 2020 on its face. Appellees allege sections 2, 3, 11 and 14 violate the Sherman Anti-Trust Act and, as such, are invalid under the supremacy clause of the U.S. Constitution. U.S. Const., art. VI, cl. 2.

In considering any state law regulating intoxicating liquors, we must begin with the Twenty-first Amendment, the second section of which provides:

"The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

The manufacture, sale and use of intoxicating liquors has traditionally been a subject of governmental regulation at both federal and state levels. Such regulation is viewed as a valid exercise of the police power to protect the public health, welfare and morals. See *Crane v. Campbell,* 245 U.S. 304, 62 L.Ed. 304, 38 S.Ct. 98 (1917); *Mugler v. Kansas,* 123 U.S. 623, 31 L.Ed. 205, 8 S.Ct. 273 (1887); *The License Cases,* 46 U.S. 504, 12 L.Ed. 256 (1847). When the Eighteenth Amendment was repealed in 1933 by the Twenty-first Amendment, each state was granted broad regulatory power over liquor traffic within its borders. That regulatory power included the authority to completely forbid the importation of liquor if a state so desired. *U.S. v. Frankfort Distilleries,* 324 U.S. 293, 89 L.Ed. 951, 65 S.Ct. 661 (1945); *State Board v. Young's Market Co.,* 299 U.S. 59, 81 L.Ed. 38, 57 S.Ct.

77 (1936). A state's power to regulate intrastate operations of liquor traffic is not restricted by the commerce clause. *Ziffrin, Inc. v. Reeves,* 308 U.S. 132, 84 L.Ed. 128, 60 S.Ct. 163 (1939). In *Hostetter v. Idlewild Liquor Corp.,* 377 U.S. 324, 330, 12 L.Ed.2d 350, 84 S.Ct. 1293 (1964), the Supreme Court held that "a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution or consumption within its borders." That holding was more recently affirmed in *Seagram & Sons v. Hostetter,* 384 U.S. 35, 42, 16 L.Ed.2d 336, 86 S.Ct. 1254 (1966).

Although the Twenty-first Amendment grants broad regulatory powers to a state with regard to intrastate regulation of liquor traffic, a state may not exercise exclusive control over liquor shipments passing through its borders which are destined for interstate use. See *Hostetter v. Idlewild Liquor Corp.,* 377 U.S. 324; *Collins v. Yosemite Park Co.,* 304 U.S. 518, 82 L.Ed. 1502, 58 S.Ct. 1009 (1938).

It is argued the state's almost absolute regulatory control recognized in *Seagram & Sons* was modified in *Craig v. Boren,* 429 U.S. 190, 50 L.Ed.2d 397, 97 S.Ct. 451 (1976). In that case, the Supreme Court struck down an Oklahoma law which prohibited the sale of 3.2% beer to males under the age of 21 and females under the age of 18. Okla. Stat. tit. 37, §§ 241 and 245 (1958 and Supp. 1976). The court found the "gender-based differential" contained in the statutes constituted a denial of equal protection to males between the ages of 18 and 20. Because the case concerned statutes pertaining to liquor regulation, the court discussed the role of the Twenty-first Amendment and whether the power it conferred upon states in the field of liquor regulation was strong enough to withstand an equal protection challenge. The court held "the Twenty-first Amendment does not save the invidious gender-based discrimination from invalidation as a denial of equal protection of the laws in violation of the Fourteenth Amendment." *Craig v. Boren,* 429 U.S. at 204-205. The issues before the court did not directly involve an application of the Commerce Clause. The court did, however, reaffirm the rule that while the Twenty-first Amendment did not repeal the Commerce Clause, the Amendment "created an exception to the normal operation of the Commerce Clause." *Craig v. Boren,* 429 U.S. at 206. That exception is clearly the overwhelming power granted

the states in the area of liquor regulation. We find the issues before the court in *Craig* did not directly involve the state's regulatory power in liquor traffic and the earlier holdings conferring that power were not modified.

This court has followed the rationale of U.S. Supreme Court cases, commencing with *State v. Payne,* 183 Kan. 396, 403, 327 P.2d 1071 (1958), where we stated:

"It has been repeatedly held that under the 21st Amendment a state may absolutely prohibit the manufacture, transportation, importation, sale or possession of alcoholic liquors irrespective of when or where produced or obtained, or the use to which they are to be put, and may adopt measures reasonably appropriate to effectuate those inhibitions and exercise full police authority in respect to them, unfettered by the due process clause, the equal protection clause or the commerce clause."

These general principles were followed in *Laird & Company v. Cheney,* 196 Kan. 675; and *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P.2d 877 (1965).

It is argued by appellees that this court deviated from those rules in *City of Baxter Springs v. Bryant,* 226 Kan. 383. We do not agree with that rationale. *City of Baxter Springs* involved a suit by the city against the proprietor of a local disco for violation of city ordinances prohibiting dispensing of beer and allowing dancing in the disco. In addition, the proprietor was charged with failure to provide an unobstructed view of the premises from the street. We discussed the application of the Twenty-first Amendment in considering the constitutionality of the city ordinances which pertained to regulation of establishments serving cereal malt beverages. The court held the ordinances unconstitutional because they were not "reasonably calculated to promote the health, sanitation, morals or general welfare of the residents of Baxter Springs . . . ." *City of Baxter Springs v. Bryant,* 226 Kan. at 392. The central issue before the court in that case was the regulation of certain types of activity in or around an establishment that dispensed cereal malt beverages. This court found a state may not, under color of the Twenty-first Amendment, impinge upon individual rights protected by the Due Process and Equal Protection clauses. See *Craig v. Boren,* 429 U.S. 190. The case did not, however, deal directly with the state's broad authority to regulate the manufacture, distribution, sale, possession and consumption of alcoholic liquor. We find that regulatory power was not modified or lessened in *City of Baxter Springs.*

In addition to the weight of authority, both federal and state, which supports the broad regulatory power of a state in the area of alcoholic liquor, we find another rationale for upholding H.B. 2020. The provisions of H.B. 2020 on its face will allow sufficient brand and price competition to withstand allegations of a violation of the Sherman Anti-Trust Act. The law is neutral and provides that any licensed distributor may obtain an exclusive franchise for one or more brand of alcoholic liquor from any licensed manufacturer for any designated area of the state. There are eight distributors, 14 categories of liquor, approximately 80 manufacturers, and well in excess of the 260 brands of alcoholic liquor initially referred to in trial exhibits, each of which is subject to a separate franchise. On its face, that would appear to present ample opportunity for each to exercise its own perserverance to obtain products and territory. If one or more fails to obtain its share of the market the law is not at fault; it is one of the hazards of a free market.

Although appellees introduced testimony showing Standard has 32.33% of the market and Famous has 31.83% of the market, there is no evidence the two companies have together embarked upon a monopolistic venture. Appellees further admit Colby, Grant-Billingsley and Kansas Distributors jointly agreed to make franchise applications for the same brands, each taking a prearranged portion of the state. This indicates they themselves may have conspired to restrain trade. Nothing in the testimony or exhibits proves H.B. 2020, on its face, provides for a combination in restraint of trade. Mr. Terrell concluded a monopoly would eventually result. We believe we may assume competition presently exists and will continue. Should any manufacturer, distributor or combination thereof conspire to restrain trade, the antitrust laws are available as a remedy.

By allowing the liquor price to seek its own level at the second tier of the liquor system, the legislature has released liquor pricing from its former status as a totally controlled commodity. The price is no longer totally regulated, totally fixed and can now fluctuate as the competition in the market place will determine. With respect to exclusive franchising, we have noted there are now at least two distributors operating in every area of the state. Each distributes different brands, which compete with one another. Although each distributor completely controls the distri-

bution of its brands within its territory we find the competition among brands to be sufficient to withstand claims of restraint of trade. We are urged by appellees to consider the recent California cases of *Midcal Aluminum, Inc. v. Rice,* 90 Cal. App. 3d 979, 153 Cal. Rptr. 757 (1979), and *Rice v. Alcoholic Bev. etc. Appeals Bd.,* 21 Cal. 3d 431, 146 Cal. Rptr. 585, 579 P.2d 476 (1978). *Rice* struck down California price maintenance statutes as a violation of policies of the Sherman Anti-Trust Act, while *Midcal Aluminum, Inc.* struck down fair trade and wine price posting provisions of the California Alcoholic Beverage Control Act, as violative of the Sherman Act. We have carefully considered these cases and find them contrary to our law and without precedent in Kansas.

We now turn to appellees' specific constitutional arguments. Appellees argue they are denied due process because they are denied the right to continue a lawful occupation. In addition, they argue the Act creates classifications which have no rational, real or substantial relationship to public safety, health, general welfare or legislative purpose in violation of the Fourteenth Amendment of the U.S. Constitution and sections 1 and 2 of the Bill of Rights of the Kansas Constitution. From our examination of the Act, we discern no such classifications or denial of the right to continue operating. All distributors are eligible to franchise any brand with state-wide territory or less. Nothing in the law denies a distributor the right to pursue liquor wholesaling. The legislature enacted legislation permitting exclusive brand franchising comparable to franchises in other industries. The size of the franchise territory and the designation of the brands are left to private agreement under the best traditions of a free society. The stated legislative purpose is to introduce competition into the pricing of liquor to the public, thereby promoting the public welfare and stopping illegal liquor traffic from out of state by offering a more competitive price. There is nothing before us to show the stated purpose is not working. The appellees' complaint is an economic one over which this court has little control. As the Court stated in *Seagram & Sons v. Hostetter,* 384 U.S. at 47:

"[I]t is not 'the province of courts to draw on their own views as to the morality, legitimacy, and usefulness of a particular business in order to decide whether a statute bears too heavily upon that business and by doing so violates due process. Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation.' "

See also *State ex rel. Schneider v. Kennedy,* 225 Kan. at 21.

Appellees' final point is that sections 2 through 11 and section 14 of H.B. 2020 are unconstitutional because they provide for an impermissible delegation of legislative authority to private persons in violation of Article 2, section 1 of the Kansas Constitution. They cite *Quality Oil Co. v. du Pont & Co.,* 182 Kan. 488, in support of the argument. *Quality* is distinguishable from the instant case. There, this court considered the Kansas Fair Trade Act which authorized a trademark owner to contract with one retailer for a minimum retail price for a named brand commodity and all retailers were bound thereby with notice. The non-signers were bound by the price agreement even though they were not parties to the contract. It left to the trademark owner the determination of whether or not a minimum price would be imposed upon which commodities and the amount. Here, the legislature determined it would not regulate wholesale prices but would let them seek their level in the competition of the market place. We understand this technique to be traditional in the capitalist society and thought by most to be the best method of determining a fair market price as long as competition is present. It is difficult to comprehend the logic of how a purposeful legislative decision to remove regulation can be transformed to the unlawful delegation of authority to regulate.

H.B. 2020 reflects the legislature's determination that a minimum price was necessary to insure an orderly market and to promote temperance and that it should be determined by the competition among wholesalers plus a minimum markup determined by the ABC Board of Review from the formula furnished by the legislature. This constitutes a permissible delegation of the ministerial act of administering the pricing regulation with a clear cut guideline. In *Laird & Company v. Cheney,* 196 Kan. 675, we held fixing wholesale liquor prices at the lowest price for which the item is sold anywhere in the United States was not violative of the commerce clause, the due process or equal protection clauses of the Fourteenth Amendment or comparable sections of the Kansas Constitution. Such practice is completely parallel to the method authorized in H.B. 2020.

We hold pursuant to the power and authority granted the state by the Twenty-first Amendment and pursuant to Article 15, § 10 of the Kansas Constitution, to promote temperance and for the

protection of the general welfare, health and safety of the people of Kansas, the legislature properly acted to permit a system of exclusive brand franchises for distributors of alcoholic liquor in Kansas for the purpose of introducing competitive pricing into the middle tier of the Kansas liquor distribution system and in passing the results of the competition onto the consumer through the retailer at not less than the competitive price, plus minimum markup. We hold Chapter 153 of the 1979 Session Laws of Kansas, known as H.B. 2020, a wholly constitutional enactment of the legislature.

The judgment of the trial court is affirmed in part and reversed in part in conformity with this opinion.

FROMME, J., not participating.