No. 53,612

STATE OF KANSAS, *ex rel.,* Perry Murray and Robert T. Stephan, *Appellees,* v. HAROLD R. PALMGREN, *et al., Appellants.*

(646 P.2d 1091)

Opinion filed June 11, 1982.

*Allen Shelton,* of Clark & Shelton, of Hill City, argued the cause and was on the brief for the appellants.

*Robert T. Stephan,* attorney general, argued the cause and *Perry Murray,* county attorney, *Steven Carr,* assistant attorney general, and *Dan Biles,* assistant attorney general, were with him on the brief for the appellees.

*Louis M. Clothier,* assistant county attorney, of Leavenworth, was on the brief *amicus curiae* for the Kansas County and District Attorneys Association.

The opinion of the court was delivered by

HERD, J.: This is an action by the State of Kansas, *ex rel.,* Perry Murray, Thomas County attorney and Robert T. Stephan, attorney general, to recover civil penalties under K.S.A. 75-4320(*a*) from the appellants, former county commissioners and hospital trustees in Thomas County, for violation of the Kansas Open Meetings Act (KOMA). K.S.A. 75-4317 *et seq.*

This case is the continuation of an intense and bitter controversy over the proposed construction of a new hospital in Thomas County. The dispute is familiar to this court. Decisions in *Pratt v. Board of Thomas County Comm'rs,* 226 Kan. 333, 597 P.2d 664 (1979), and *Thomas County Taxpayers Ass'n v. Finney,* 223 Kan. 434, 573 P.2d 1073 (1978), set aside two county bond elections for hospital construction because of legal irregularities and effectively halted construction of a tax-supported hospital in Thomas County. Following the last decision, a group of Thomas County residents gave up the quest for a tax-supported hospital and began searching for an alternate method of providing medical care for the county. They formed a non-profit corporation and launched a fund drive for the building of a private non-profit hospital. During this time Harold Palmgren, William Randall and John Renner made up the Board of County Commissioners. Samuel Friesen, Eugene Karlin, Woodrow Kemp, Marilyn Rall,

Lloyd Theimer and Harold Upchurch sat on the county hospital board of trustees, members of which are appointed by the county commission. These public officials opposed the construction of a new hospital. They sought to frustrate the construction of the non-profit hospital by preparing a proposal for remodeling the existing county hospital.

In furtherance of their plan, on November 3, 1979, the three commissioners, along with trustee Theimer, Upchurch and Karlin, met with an architect, John Shaver of Salina, to discuss Shaver's work on a preliminary energy audit and the possibility of obtaining federal funds for energy-related improvements to Thomas County Hospital. The meeting was requested by the architect. Upchurch took the lead in notifying the commissioners and trustees. The time was set for 10:00 a.m., November 3, 1979. The meeting was held according to plan and resulted in a letter from Shaver to the commissioners notifying them he had informed the Kansas Energy Office they were interested in obtaining federal energy funds for the hospital. The application was completed, awaiting official approval prior to filing.

There are two other meetings complained of in the State's petition. They occurred on November 23 and November 30, 1979, and were the result of the trustees' dissatisfaction with the hospital management under Hospital Affiliates International (HAI). Coincidentally, HAI supported the building of the non-profit hospital.

On November 23 four of the hospital trustees journeyed to Goodland in Karlin's car and met with Bill Wilson, administrator of the Northwest Kansas Medical Center. During the meeting attended by Wilson on the one hand and Karlin, Theimer, Upchurch and Friesen on the other, they discussed their plans to terminate HAI. They also inquired of Wilson's management policies, philosophy and experience as a hospital administrator and asked if he would be interested in administering their hospital.

Wilson expressed interest but advised the trustees he would not offer them a contract while HAI was providing management services. In spite of his statement, the next day Wilson discussed the trustees' proposal with Northwest's attorney and requested him to draft a contract accordingly. Wilson also discussed the Thomas County proposal with his board which authorized him to enter into a ninety-day contract.

On November 27, the appellant trustees met in an open meeting and voted unanimously to terminate the HAI contract. There was no discussion. On November 29 the attorney for Northwest submitted the proposed contract to Wilson.

The next meeting complained of occurred on November 30, 1979. It also took place in Goodland where trustees Karlin, Theimer and Upchurch met with Wilson. Once again the topic for discussion was the possibility of contracting with Wilson to manage Thomas County Hospital, now that the HAI was terminated. Wilson was asked to present his contract proposal to the full board of trustees. Appellant Karlin, chairman of the trustees, testified the Goodland meetings were prearranged and were for the purpose of "looking for an administrator" for the hospital.

The trial court found all the meetings were prearranged, not open to the public, held for the purpose of discussing the business or affairs of the body and attended by a majority of a quorum, thus violating KOMA. The county commissioners and trustee Friesen were fined $10 each for attending one meeting. Karlin, Upchurch and Theimer were fined $30 each for attending all three meetings. Rall and Kemp who attended none of the meetings were absolved. Costs were taxed to appellants. They appeal.

Appellants first complain the trial court erred in refusing to permit discovery in support of their defense of discriminatory prosecution. They filed a Request for Production of Documents asking for all files, reports, documents, tapes, transcripts, field notes, and all other documents in the office of the attorney general or county attorney of Thomas County which in any way relate to any investigation or complaint of alleged violations of the KOMA from 1972-80. They also requested all documents relating to investigations of alleged violations of the KOMA by the Kansas Corporation Commission (KCC) and officials in Galena and Wichita. Finally, they requested all tapes, video or audio, transcripts, press releases, position statements or similar items disseminated to any newspaper, magazine, radio or television station in Kansas in which the attorney general discussed KOMA or any investigation of violations thereof and all tapes, statements and transcripts of a TV program from Wichita titled "Access."

The trial court denied the motion.

In January 1981 appellants served appellees with the following interrogatories:

"Interrogatory No. 1. State the number of complaints received by your office alleging violations of KOMA since its enactment, and with reference thereto, state:

"A. The number of complaints received during your term of office:

"B. The number of complaints investigated in some manner by your office, and of those investigated, state the number of complaints investigated by the KBI.

. . . .

"Interrogatory No. 3. Regarding such complaints or requested opinions, state the number of instances since the enactment of KOMA, in which it was determined by your office, either formally or informally, that at least a 'technical' violation of KOMA had occurred. With regard to such instances, state:

"A. The number of such apparent violations resulting in the filing of legal proceedings by your office, giving the date of filing, the Court where filed, and the style and number of each such case;

"B. As to each such legal action instituted, state the legal remedy sought by your office in such proceeding;

"C. Identify each such legal action where either civil or criminal penalties were sought;

"D. State the criteria or circumstances distinguishing each apparent violation resulting in legal proceedings from those apparent violations where no such proceedings were instituted."

The State filed a motion for a protective order on the grounds the trial court had previously denied the request for production of documents which pertained to the same material covered by the interrogatories. It also claimed the information requested was neither relevant nor material and to furnish it would burden the attorney general's office. After argument at pretrial, the trial court granted the protective order and ruled appellants were barred from asserting the defense of discriminatory prosecution under the doctrine of separation of powers.

The discretion whether or not to prosecute has long been the sacred domain of the prosecutor and stems from the common law *nolle prosequi. State v. Greenlee,* 228 Kan. 712, 717, 620 P.2d 1132 (1980). Nevertheless, discriminatory prosecution is now generally recognized to constitute a valid defense to a criminal charge. Annot., 95 A.L.R.3d 280, 296.

To be successful, a defendant alleging discriminatory prosecution must show: 1) Others who are similarly situated are not generally prosecuted for conduct similar to that for which defendant is being prosecuted, and 2) the defendant has been intentionally and purposefully singled out for prosecution on the basis of an arbitrary or invidious criterion. Annot., 95 A.L.R.3d at

287. See also *Barton v. Malley,* 626 F.2d 151, 155 (10th Cir. 1980). The defense is solidly based on the Equal Protection Clause of the 14th Amendment. See *Yick Wo v. Hopkins,* 118 U.S. 356, 30 L.Ed. 220, 6 S.Ct. 1064 (1886). Mere failure to enforce the law against other violators, however, does not establish a claim of discriminatory prosecution. *Oyler v. Boles,* 368 U.S. 448, 7 L.Ed.2d 446, 82 S.Ct. 501 (1962); *Gladen v. State,* 196 Kan. 586, 590, 413 P.2d 124 (1966).

Clearly a constitutionally based claim such as discriminatory prosecution should always be available to a defendant. To hold, as the trial court did here, that separation of powers prohibits a defendant from asserting this defense is to ignore the very constitution from which this doctrine is derived. Granted, the decision whether or not to prosecute is most often solely that of the prosecutor. This decision, however, must be made with constitutional limits on discretion in mind. When the decision purports to deny a defendant his basic constitutional rights, it is up to the judiciary to weigh the prosecutor's adherence to constitutional principles. See *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 49, 2 L.Ed. 60 (1803).

Even though the trial judge's reasoning was erroneous, he reached the correct result. Most federal courts have held a defendant must prove a "colorable entitlement" to the defense of discriminatory prosecution before discovery is allowed. This procedure is used to avoid the use of the defense as a means of obtaining information to which a defendant is otherwise not entitled. *United States v. Murdock,* 548 F.2d 599, 600 (5th Cir. 1977). See also *United States v. Johnson,* 577 F.2d 1304, 1309 (5th Cir. 1978); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974); *United States v. Berrigan,* 482 F.2d 171, 181 (3rd Cir. 1973). The test, the 5th Circuit Court of Appeals has said, "is materiality, the court is entitled to have the defendant demonstrate the materiality of what he seeks by proving a colorable entitlement to the defense before discovery is allowed." *Murdock,* 548 F.2d at 600. Support for this position is found in K.S.A. 60-226(*b*)(1) which states: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action  . . . ."

Here there was no showing by appellants of a colorable entitlement to the defense. No specific instances of other violations of

the KOMA were ever supplied to the trial court. There is no showing of abuse of discretion. The issue is without merit.

Appellants next argue KOMA is a penal statute and must be construed strictly against the State, which the trial court failed to do.

K.S.A. 75-4320(a) provides up to $500 in civil penalties may be assessed against any person who violates the act. Appellants argue since the KOMA threatens a monetary penalty for its violation, it must be considered a penal statute and therefore strictly construed. Indeed, Black's Law Dictionary 1289 (4th ed. 1951) defines penal as "containing a penalty." This court has long adhered to the rule a penal statute should be strictly construed. See, *e.g., State v. Kearns,* 229 Kan. 207, 208, 623 P.2d 507 (1981); *State v. Doyen,* 224 Kan. 482, 488, 580 P.2d 1351 (1978). Thus, if the KOMA can be characterized as penal, it might arguably be strictly construed. This theory, however, flies in the face of the purpose of the KOMA, stated in K.S.A. 75-4317(a): "In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the policy of this state that meetings for the conduct of government affairs and the transaction of governmental business be open to the public." Obviously, the intent behind the statute is to protect the public. In *Johnson v. Killion,* 178 Kan. 154, 158-59, 283 P.2d 433 (1955), this court stated: "It is fundamental that where a statute is designed to protect the public, the language must be construed in the light of the legislative intent and purpose and is entitled to a broad interpretation so that its public purpose may be fully carried out." See also *Smith v. Marshall,* 225 Kan. 70, 75, 587 P.2d 320 (1978).

Other courts have used various methods of reaching the conclusion an act providing for civil penalties should be liberally construed. In *State v. O'Neill Investigations, Inc.,* 609 P.2d 520 (Alaska 1980), the Alaska Supreme Court dealt with that state's Unfair Trade Practices and Consumer Protection Act. Even though the Act provided for a civil penalty of up to $5,000 the court held the statute was not penal and thus should not be strictly construed. The court found the legislature's characterization of the penalty as civil made the statute remedial and subject to a broad interpretation. (Two other justices concurred, stating that because the statute's thrust was regulatory rather than crimi-

nal it should not be strictly construed.) Similarly, in *State v. Strong Oil Co., Inc.,* 105 Misc.2d 803, 433 N.Y.S.2d 345 (1980), the court interpreted a state statute designed to discourage price gouging by merchants of home heating oil, stating, "[W]here a statute is found to be beneficial to the public, though penal as to some persons, it will receive an equitable construction in order not to defeat its general as well as its specific purpose." Finally, in *State v. Hamilton,* 388 So. 2d 561, 563 (Fla. 1980), the court began its examination of state environmental protection legislation with the principle, " 'A statute enacted for the public benefit should be construed liberally in favor of the public even though it contains a penal provision.' *City of Miami Beach v. Berns,* 245 So. 2d 38, 40 (Fla. 1971)."

Other states with open meetings acts have construed their statutes broadly. In *Board of Public Instruction of Broward Co. v. Doran,* 224 So. 2d 693, 699 (Fla. 1969), the Florida Supreme Court stated: "The fact that the statute contains a penal provision does not make the entire statute penal so that it must be strictly construed." Statutes enacted for the public benefit, the Florida court said, must be interpreted favorably to the public. See also *Wolfson v. State,* 344 So. 2d 611, 613 (Fla. Dist. Ct. App. 1977); *Laman v. McCord,* 245 Ark. 401, 404, 432 S.W.2d 753 (1968).

Finally, a recent amendment to the KOMA is further evidence the act should be liberally interpreted. K.S.A. 1981 Supp. 75-4320a(*b*) discourages any comparison with criminal actions, stating: "In any action hereunder, the burden of proof shall be on the public body or agency to sustain its action."

We hold the KOMA is remedial in nature and therefore subject to broad construction in order to carry out the stated legislative intent.

Appellants next contend the KOMA is unconstitutionally vague and overbroad. They argue a broad construction of the act will insure this result. Pertinent parts of the act are as follows:

K.S.A. 75-4317a:

"**Meeting defined.** As used in this act, 'meeting' means any prearranged gathering or assembly by a majority of a quorum of the membership of a body or agency subject to this act for the purpose of discussing the business or affairs of the body or agency."

K.S.A. 1981 Supp. 75-4318:

"**Meetings of state and subdivisions open to public; exceptions; secret ballots;**

notice; agenda, cameras, photographic lights, recording devices. (*a*) Except as otherwise provided by state or federal law or by rules of the house or senate, and except with respect to any impeachment inquiry or other impeachment matter referred to any committee of the house of representatives prior to the report of such committee to the full house of representatives, all meetings for the conduct of the affairs of, and the transaction of business by, all legislative and administrative bodies and agencies of the state and political and taxing subdivisions thereof, including boards, commissions, authorities, councils, committees, subcommittees and other subordinate groups thereof, receiving or expending and supported in whole or in part by public funds shall be open to the public and no binding action by such bodies shall be by secret ballot, but any administrative body that is authorized by law to exercise quasi-judicial functions shall not be required to have open meetings when such body is deliberating matters relating to a decision involving such quasi-judicial functions."

Let us first consider the rules of construction on the constitutional challenge of a statute. We have stated on innumerable occasions the constitutionality of a statute is presumed; all doubts must be resolved in favor of its validity, and before a statute may be stricken it must clearly appear there is a constitutional violation. We have gone on to say, in determining constitutionality, it is the court's duty to uphold the statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, it should be done. Statutes are not stricken unless the infringement of the superior law is clear beyond a reasonable doubt. *Von Ruden v. Miller,* 231 Kan. 1, 642 P.2d 91 (1982); *In re Brooks,* 228 Kan. 541, 543, 618 P.2d 814 (1980); *State v. Huffman,* 228 Kan. 186, 189, 612 P.2d 630 (1980); *Colby Distributing Co. v. Lennen,* 227 Kan. 179, 186-87, 606 P.2d 102 (1980); *State v. Meinert,* 225 Kan. 816, 817, 594 P.2d 232 (1979).

Against this background let us examine the rules regarding vagueness and overbreadth:

"The test to determine whether a criminal statute is unconstitutionally void by reason of being vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. If a statute conveys this warning it is not void for vagueness. Conversely, a statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process. At its heart the test for vagueness is a commonsense determination of fundamental fairness." *State v. Kirby,* 222 Kan. 1, 4, 563 P.2d 408 (1977).

See also *State v. Meinert,* 225 Kan. at 817; 16A Am. Jur. 2d, Constitutional Law § 818 at p. 988. The test for noncriminal statutes is essentially the same. See *Broadrick v. Oklahoma,* 413

U.S. 601, 37 L.Ed.2d 830, 93 S.Ct. 2908 (1973); *Keyishian v. Board of Regents,* 385 U.S. 589, 17 L.Ed.2d 629, 87 S.Ct. 675 (1967); *Jordan v. De George,* 341 U.S. 223, 95 L.Ed. 886, 71 S.Ct. 703, *reh. denied* 341 U.S. 956 (1951). The standards of certainty in a statute punishing for criminal offenses, however, are higher than in those depending primarily upon civil sanction for enforcement. *State v. Conley,* 216 Kan. 66, 67, 531 P.2d 36 (1975); *State v. Hill,* 189 Kan. 403, 411, 369 P.2d 365 (1962). For example, in *In re Brooks,* 228 Kan. at 544, we held standards for judging the vagueness of statutes pertaining to termination of parental rights should rest somewhere between the rigid standards governing criminal statutes and the more flexible rules regarding statutes which regulate business. Where a noncriminal statute is set out in terms the ordinary person exercising ordinary common sense can sufficiently understand and comply with, the statute is not unconstitutionally vague. *CSC v. Letter Carriers,* 413 U.S. 548, 37 L.Ed.2d 796, 93 S.Ct. 2880 (1973); *Harris v. McRae,* 448 U.S. 297, 311 n. 17, 65 L.Ed.2d 784, 100 S.Ct. 2671, *reh. denied* 448 U.S. 917 (1980).

Finally, it should be noted that where First Amendment rights are involved, "stricter standards of permissible statutory vagueness" apply to a statute, *i.e.,* the government may regulate in this area only with narrow specificity. *Smith v. Goguen,* 415 U.S. 566, 573, 39 L.Ed.2d 605, 94 S.Ct. 1242 (1974); *Smith v. California,* 361 U.S. 147, 151, 4 L.Ed.2d 205, 80 S.Ct. 215 (1959); *State v. Stauffer Communications, Inc.,* 225 Kan. 540, 546, 592 P.2d 891 (1979).

While a vague statute leaves persons of common intelligence to guess at its meaning, an overbroad statute makes conduct punishable which under some circumstances is constitutionally protected. *State v. Huffman,* 228 Kan. at 189; *State v. Stauffer Communications, Inc.,* 225 Kan. at 547. Obviously, almost every law is potentially applicable to constitutionally protected acts. A successful overbreadth challenge can thus be made only when 1) the protected activity is a significant part of the law's target, and 2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications. See Tribe, American Constitutional Law § 12-24, p. 711 (2nd ed. 1978).

The challenge for overbreadth can be easily dismissed. Appellants argue the KOMA has a potential inhibiting effect on the

"rights of public officials to assemble and discuss public affairs." It is urged citizens have the right to unfettered discussion of governmental affairs in private while retaining anonymity. Appellants' claim reveals a basic misconception regarding the nature of a public official's position. The First Amendment does indeed protect private discussions of governmental affairs among citizens. Everything changes, however, when a person is elected to public office. Elected officials are supposed to represent their constituents. In order for those constituents to determine whether this is in fact the case they need to know how their representative has acted on matters of public concern. Democracy is threatened when public decisions are made in private. Elected officials have no constitutional right to conduct governmental affairs behind closed doors. Their duty is to inform the electorate, not hide from it. The KOMA places no constraints on purely private discussions by public officials. It regulates only the conduct of public business. As such the KOMA is not unconstitutionally overbroad.

Let us now turn to appellant's constitutional challenge of KOMA based on vagueness. Their first claim of vagueness comes from a comparison of K.S.A. 75-4317a and K.S.A. 1981 Supp. 75-4318. K.S.A. 75-4317a clearly defines a meeting as "any prearranged gathering . . . . for the purpose of discussing the business or affairs of the body or agency." While K.S.A. 1981 Supp. 75-4318 states all meetings "for the conduct of the affairs of, and the transaction of business by" such a body or agency shall be open to the public. Appellants argue it is impossible to determine what type of meeting of public officials must be open. They claim the restrictive language of K.S.A. 1981 Supp. 75-4318 implies "binding action" is necessary before a meeting comes under the act. We do not agree. K.S.A. 75-4317a and K.S.A. 1981 Supp. 75-4318 shall be read together. They are not incompatible. We construe the two sections to mean all prearranged gatherings by a majority of a quorum of all legislative and administrative bodies, agencies of the state and political and taxing subdivisions thereof, including boards, commissions, authorities, councils, committees, subcommittees, and other subordinate groups thereof, receiving or expending and supported in whole or in part by public funds shall be open to the public when the purpose of the gathering is to discuss, conduct or transact the business or affairs of the body or agency. American Heritage Dictionary of the

English Language 278 (2nd ed. 1969), defines "conduct" as: "To direct the course of; manage; control." Similarly, "transact" is defined as: "To do, carry out, perform, manage, or conduct . . . ." p. 1362. The two terms are essentially synonymous. When examined in light of the legislative purpose set out in the initial section of KOMA no vagueness exists. Words such as "discuss," "conduct," and "transact" should be construed according to the legislative purpose of the statute and the approved usage of the language. Since they are words in common usage they should be given their natural and ordinary meaning. *Coe v. Security National Ins. Co.*, 228 Kan. 624, 629-30, 620 P.2d 1108 (1980). As such, an average person exercising ordinary common sense can understand the words sufficiently to comply with the act. See generally, Tacha, *The Kansas Open Meeting Act: Sunshine on the Sunflower State?* 25 Kan. L. Rev. 169 (1977); Smoot and Clothier, *Open Meetings Profile: The Prosecutor's View*, 20 Washburn L.J. 241 (1981). We hold the words "discuss," "conduct," and "transact," as used in the act, are not vague.

Next appellants argue the act is vague as to the governmental groups covered. They maintain it is unclear whether "subordinate groups thereof," such as the board of trustees of a county hospital, must receive and expend public funds themselves to be included in the act or whether it is enough that only the parent body, such as the board of county commissioners, receive and expend public funds. Smoot and Clothier suggest the following test to determine what public body falls within the ambit of KOMA:

"First the group of people meeting together must be a 'body or agency' within the meaning of the Act. Second, the group must have legislative or administrative powers or at least be legislative or administrative in its method of conduct. Third, the body must be part of a governmental entity at the state or local level, whether it is the governing body or some subordinate group. Fourth, it must receive or expend public funds or be a subordinate group of a body subject to the Act. Finally, it must be supported in whole or in part by public funds or be a subordinate group of a body which is so financed." 20 Washburn L.J. at 256-57.

Professor Tacha's article removes any doubt regarding the "public funds" terminology:

"If the section were interpreted as it grammatically should be, so long as the parent state or local body meets the public funding test, all subordinate groups would automatically be covered by the Act regardless of the degree or existence of public funding." 25 Kan. L. Rev. at 186.

The Thomas County Board of County Commissioners receives and expends public funds; the board of trustees of the Thomas County Hospital is a "subordinate group thereof" and is therefore covered by KOMA. We hold the KOMA is not unconstitutionally vague.

Appellants next argue the trial court's finding: "The record does not show that the acts of the defendants on these occasions were committed with any intent to violate the open meetings act," eliminates them from penalties under K.S.A. 75-4320(*a*). That statute provides:

"Any member of a body or agency subject to this act who knowingly violates any of the provisions of this act or who intentionally fails to furnish information as required by subsection (*b*) of K.S.A. 75-4318 shall be liable for the payment of a civil penalty in an action brought by the attorney general or county or district attorney, in a sum set by the court of not to exceed five hundred dollars ($500) for each violation."

Appellants maintain that they were advised by the county attorney their meetings were not covered by KOMA and that a "good faith" violation is in fact not a violation at all. This argument flies in the face of an impressive body of authority and the ancient maxim, "Ignorance of the law is no excuse." Further, appellants' interpretation of the statute is not in accord with Kansas law.

In *State v. Millhaubt,* 144 Kan. 574, 581, 61 P.2d 1356 (1936), a criminal prosecution, the court stated:

"Where the statute defines the duties of a county officer and specifies acts he shall not do, if he intentionally does certain of those acts, and their being done is prohibited, he intentionally violates the law."

Appellee makes a further comparison to criminal statutes:

"Analogously, this Court should note the Kansas prosecutor's burden in criminal prosecutions is to establish a general criminal intent as an essential element of every crime defined by the criminal code, by proof of 'willful conduct.' K.S.A. 21-4301(1). 'Willful conduct' is defined as

. . . conduct that is purposeful and intentional and not accidental. As used in this code (criminal code), the terms '*knowing*,' 'intentional,' 'purposeful,' and 'on purpose' are included within the term 'willful.' K.S.A. 21-3201(2). (Emphasis supplied.)

Moreover, proof of 'criminal intent' does not require proof of knowledge of the existence or constitutionality of the statute under which the accused is prosecuted, *or the scope or meaning of the terms used in that statute.* K.S.A. 21-3202(1). (Emphasis supplied.)

"Accordingly, in *State v. Hodge,* 204 Kan. 98, 460 P.2d 596 (1969), the Court

rejected defendant's argument that the term 'willfully violates' as it was used in the Kansas Securities Act required proof of a specific intent to violate the securities law to obtain a conviction. The Court stated: 'No specific intent is necessary to constitute the offense where one violates the securities act *except the intent to do the act denounced by the statute.*' 204 Kan. at 107. (Emphasis supplied.) The Court further noted, 'all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing . . . .' 204 Kan. at 108 and Syllabus 10."

Thus, it is logical not to set more stringent standards in a case imposing civil penalties than those imposed in a criminal prosecution.

Appellants knowingly held three prearranged meetings for the purpose of discussing, conducting and transacting governmental affairs and business. A majority of a quorum of the governmental body was present each time but none of the three meetings were open to the public. Appellants violated the Act and are subject to its penalties. This issue is without merit.

Appellants next argue the trial court did not specify the State's burden of proof and, no matter what standard of proof is used, the State did not meet its burden.

It should be noted that K.S.A. 1981 Supp. 75-4320a(*b*), not in effect during the time periods relevant to this case, now states "the burden of proof shall be on the public body or agency to sustain its action." Certainly, then, something less than the criminal standard of beyond a reasonable doubt was intended.

Even under the strictest standard, however, the evidence is sufficient to support the trial court. To prove its case the State had to show: 1) A meeting of a body or agency subject to the act occurred; 2) a majority of a quorum of the members were present; 3) the meeting was prearranged; 4) the meeting was conducted for the purpose of discussing, conducting, or transacting the business or affairs of the body or agency; and 5) the meeting was not open to the public. As the foregoing evidence clearly demonstrates there was substantial evidence to support the State's case. The issue is without merit.

Appellants next argue the trial court erred in refusing to admit certain exhibits into evidence. The excluded exhibits fall into two categories. Group One supports appellants' defense of discriminatory prosecution. It consists of exhibits 2, 3, 12A and 12D. Exhibit 2 includes letters from appellants Rall and Theimer to the attorney general complaining of violations of KOMA by official

boards in Thomas County. Exhibit 3 is a reply to exhibit 2 by an assistant attorney general. Exhibits 12A and 12D are letters from appellant Rall to the Board of County Commissioners of Thomas County and the Board of Trustees of Thomas County Hospital, requesting notice of all meetings of the boards. This evidence was offered to prove the instant action was filed for political reasons to force appellants to resign from office, which they did.

Under K.S.A. 60-401(*b*) and 407(*f*), all relevant evidence is admissible. Relevancy is a matter of logic and experience and the trial court naturally possesses a certain amount of discretion in this area. *Farmers Ins. Exchange v. Schropp,* 222 Kan. 612, 624, 567 P.2d 1359 (1977); *State v. Faulkner,* 220 Kan. 153, 155, 551 P.2d 1247 (1976). The trial court properly excluded the evidence. The self-serving letters written by appellants to the attorney general after the investigation in this case had begun are irrelevant to the issue of discriminatory prosecution.

Group Two is exhibit 1 and consists of all the attorney general's opinions concerning the KOMA and was offered to prove the KOMA is vague and overbroad. At the time the exhibit was offered, the court had already ruled on vagueness and overbreadth. The exclusion of the exhibit was proper.

Finally, appellants contend the trial court erred in assessing the costs of the action against all of the appellants when two were not found in violation of the act. We construe the trial court's order to assess the costs against the appellants adjudged in violation of the act.

The judgment of the trial court is affirmed.

FROMME, J., dissenting. The community fight in Thomas County between opposing factions was and is regrettable. The present action brought by the attorney general to recover so-called civil penalties for alleged knowing violations of the open meetings law against former public officials is but another chapter in that local community fight. This court is taking no sides in this bitter controversy other than to examine the provisions of the open meetings law and apply those provisions to the facts as they come to us in a printed record. I do not agree that this record of proceedings justifies the conclusion of the majority that these defendants "sought to frustrate the construction of the non-profit hospital by preparing a proposal for remodeling the

existing county hospital." The words "sought to frustrate" attribute some improper motive to the decisions of these defendants while acting as public officials.

All of us agree that elected officials cannot be permitted to conduct governmental affairs behind closed doors. That did not occur under the facts appearing in the record of this case. All of us agree that public officials do have a duty to inform their constituents and not to hide from them. Here again the evidence in this record established no secret meetings and no one testified to having been excluded from any meeting.

The penalties for the crimes of which these public officials were convicted were assessed under the open meetings law. They were imposed against these former members of two separate public bodies—the Board of County Commissioners and the Board of County Hospital Trustees.

The county clerk, Rosalie Seemann, testified it was her duty to notify the members of the Board of County Commissioners and the members of the public concerning the time, place and purpose of meetings. She further testified that she was never advised not to give notice of any meeting.

Edna Hansen testified she was the administrative and recording secretary for the Board of Trustees of the hospital. It was her practice to give notice of meetings of the Board of Trustees by notifying the newspaper, The Colby Free Press, and the local radio station, KXXX, when she was advised of a meeting by the chairman. She further testified that she had received some 42 letters requesting personal notice of meetings of the board, and because of the time and expense involved in giving personal notice the board adopted a practice to respond personally only when self-addressed and stamped envelopes were provided. The 42 letter-requests were not received by her until after the November 3, 1979, meeting.

It was stipulated that no notices were given of the meetings which formed the bases for the penalties in this case. I do not believe these gatherings were meetings required to be open with advance public notice as contemplated by the open meetings law. Neither do I believe that in these meetings the affairs of these bodies were conducted and business transacted as contemplated by K.S.A. 1981 Supp. 75-4318.

The first meeting was hurriedly called at the request of a Mr.

Shaver from Salina who had previously been consulted in regard to a possible energy audit. He contacted Mr. Upchurch of the Board of Trustees. Upchurch in turn passed the word around that Architect Shaver wanted to talk the next day to some of the county commissioners and some members of the Board of Trustees at the hospital building to gather information for energy application forms. The members of both boards, who were notified and could attend, met in the Thomas County Hospital. The building and plant were surveyed and Mr. Shaver obtained information to fill out the forms. No final decision for hiring of Shaver to file the application was agreed on until a later meeting of the Board of County Commissioners held on November 7, 1979, after notice was given to the public by the county clerk.

The second and third so-called meetings were held by members of the Board of Trustees of the Thomas County Hospital in the Northwest Kansas Medical Center at Goodland, Kansas. The public officers went to Goodland to interview a man for the position of administrator of the Thomas County Hospital. No one was hired, either then or later.

In all three of these meetings no binding action was taken, the meetings occurred in public buildings, and I can find nothing in the record to indicate a single person was turned away from the door.

The penalty provision of the Kansas Open Meetings Act reads as follows:

"(a) Any member of a body or agency subject to this act *who knowingly violates* any of the provisions of this act *or who intentionally fails* to furnish information as required by subsection (b) of K.S.A. 75-4318 shall be liable for the payment of a civil penalty in an action brought by the attorney general or county or district attorney, in a sum set by the court of not to exceed five hundred dollars ($500) for each violation. In addition, *any binding action* which is taken at a meeting not in substantial compliance with the provisions of this act *shall be voidable* in any action brought by the attorney general or county or district attorney in the district court of the county in which the meeting was held within ten (10) days of the meeting, and the court shall have jurisdiction to issue injunctions or writs of mandamus to enforce the provisions of this act.

"(b) Civil penalties sued for and recovered hereunder by the attorney general shall be paid into the state general fund. Civil penalties sued for and recovered hereunder by a county or district attorney shall be paid into the general fund of the county where the proceedings were instigated." K.S.A. 75-4320. Emphasis supplied.

I note the action which is considered voidable under this

penalty provision is referred to as any "binding action." I further note that, although the penalty is referred to as a civil penalty, a violation subjects the violator to a class C misdemeanor punishable by a civil penalty or fine of not to exceed $500.00.

The act provides for notice as follows:

"(b) Notice of the date, time and place of any regular or special meeting of a public body designated hereinabove shall be furnished *to any person requesting such information,* except that:

"(1) If notice is requested by petition, the petition shall designate one person to receive notice on behalf of all persons named in the petition, and notice to such person shall constitute notice to all persons named in the petition; and

"(2) if notice is furnished to an executive officer of an employees' organization or trade association, such notice shall be deemed to have been furnished to the entire membership of such organization or association.

"(c) It shall be the duty of the presiding officer or other person calling the meeting, if the meeting is not called by the presiding officer, to furnish the information required by subsection (b).

"(d) Prior to any meeting hereinabove mentioned, any agenda relating to the business to be transacted at such meeting shall be made available *to any person requesting said agenda."* K.S.A. 1981 Supp. 75-4318. Emphasis supplied.

The above provision raises some question as to whether a "knowing violation" of the act occurred in the present case in the absence of a request for the information in advance of the meetings. The secretary to the Board of Trustees of the hospital received 42 letters of request for notice of time, place, and meeting agenda for all regular, special, and executive session meetings. However, none of these were dated or received before the November 3rd meeting which was the basis for convictions under Count I.

Be that as it may, my disagreement with the majority stems from the expansion of the term "open meeting" to all meetings. Although "meeting" is defined in K.S.A. 75-4317a to include any prearranged gathering of a majority of the membership for the purpose of discussing the business or affairs of the body, this does not require a construction that every such "meeting" is to be an "open meeting." If such were the case, the three county commissioners could not legally arrange to eat lunch together.

K.S.A. 1981 Supp. 75-4318 is the section of the act which says what meetings must be open to the public. That section of the statute limits the "open meeting" to "all meetings for the conduct of the affairs of, and the transaction of business." It should be noted that the section covering the penalties, K.S.A. 75-4320,

refers only to this section of the statute. The penalty section does not mention or impose penalties for meetings as defined in 75-4317a.

I cannot believe it was intended to prevent members of public bodies from attending emergency meetings for which there is little or no opportunity for advance public notice. They also should be permitted to attend meetings to interview prospective employees living in a neighboring city. Surely the public would have no right to insist on accompanying the officials when they conduct such interviews. Especially should this kind of trip be permitted when no "binding action" is contemplated and none taken. To hold otherwise, a public body could not take care of emergency matters. Closed executive sessions require a formal motion acted on at a regular called meeting. K.S.A. 1981 Supp. 75-4319. There would be no opportunity to call the required meeting necessary to act on the motion for executive session.

The open meetings law was not passed to prevent public bodies from attending to emergency matters when it is impossible to give advance notice. If no "binding action" is taken until later at a regular called meeting open to the public I can see no violation. Such was the evidence in the present case.

The use of a criminal penalty for enforcement of the open meetings law in this case, instead of the remedies of mandamus and injunctive relief, did nothing to further open meetings in Thomas County. These former members of public bodies are no longer in office. Under the majority opinion the present officers could be fined for violating this law for failure to give notice. So-called civil penalties in this case are nothing less than fines assessed against former public officers. It is quite apparent that some of these misdemeanants attended other similar meetings on the advice of the county attorney. Even the county attorney did not understand that all gatherings were subject to the penalties of the open meetings law. Prior to today this court had never decided that question. The penalty provision of the law requires a knowing violation but under the majority opinion a violation occurs regardless of intent to violate the act.

I feel the construction placed upon this act by the majority opinion is much too restrictive. It will not permit public officials to act in emergencies. It will not permit them to carry out ordinary personal fact-finding tours. It will not permit public officials to

conduct employee interviews in the prospective employee's usual and customary environment. The open meetings law was never meant to be so restrictive and I respectfully dissent.