(53 P.3d 1234)
No. 88,063

JILL SKILLETT, *Appellee*, v. RUBEN SIERRA, *Appellant*, and B.S., a
Minor Child, by and through Her Mother and Next Friend, JILL
SKILLETT, and JILL SKILLETT, individually, *Appellees*, v. RUBEN
SIERRA, *Appellant*.

Opinion filed September 13, 2002.

*Ronald W. Nelson*, of Rose, Nelson & Booth, of Overland Park, for the appellant.

*Donald R. Whitney*, of Law Offices of Donald R. Whitney, Chartered, of Overland Park, for the appellees.

Before JOHNSON, P.J., LEWIS, J., and TOM MALONE, District Judge, assigned.

LEWIS, J.: This is a domestic action which is complicated procedurally and contains issues appealed by both parties.

Ruben Sierra and Jill Skillett resided together and were the natural parents of B.S. Skillett had two other daughters from a previous marriage, J.S. and L.S.

In September 2000, Skillett filed a petition under the Protection From Abuse (PFA) Act, K.S.A. 60-3101 *et seq.*, against Sierra. The basis of this action was Skillett's allegation that Sierra had engaged in sexual conduct with her daughters from a previous marriage who were under the age of 16 and neither of whom was his spouse. After a hearing before the district magistrate judge, which resulted in a judgment in favor of Skillett, Sierra appealed to the district court.

In December 2000, Skillett filed a petition for a determination of parentage. That action alleged that Sierra was the father of B.S., and it sought that determination along with orders for custody and child support. We turn first to the facts of the PFA action.

It appears the parties lived together for several years but never married. They often fought, separated, and reunited. However, from the period of July 1998 until August 1999, Sierra was at Skillett's house on a daily basis, and he watched the children in the evenings because Skillett often worked or had appointments during those hours.

In the PFA action, Skillett testified as to a number of sexual advances that Sierra had made to her daughters. On one occasion in 1995, according to Skillett, Sierra held J.S. by her legs and had her head in the bathtub under water, telling her to hold her breath. He also told her to do a handstand against the wall and that she would be in trouble if she got down. Skillett was upset when she found out this was happening. Sierra told Skillett he was just playing.

In 1998, Sierra was apparently intoxicated and demanded oral sex from Skillett. When Skillett refused to accommodate him, he threatened to go to J.S. "because she'll do anything I ask her to do." Skillett indicated that in order to protect J.S., she agreed to Sierra's demands. The next morning, Sierra told her he did not mean what he said. In May 1999, however, Skillett came home late. She went by J.S.'s bedroom and saw J.S. in bed, lying on her back with her knees propped up. She was not clothed from the waist down. Sierra was crouched over J.S. with his face between her legs holding a washcloth. Skillett confronted Sierra over his conduct, and he stated that he was only cleaning up J.S. because she smelled bad and had poor hygiene.

On another occasion, Skillett told Sierra that she had gone into the bathroom and opened the shower door and that J.S. became very embarrassed. A few minutes later, Sierra left and when he came back, he told Skillett that he went into the bathroom and opened the shower door and J.S. was not embarrassed.

In August 2000, J.S. told Skillett that she did not care if she lived. Skillett asked J.S.'s stepmother to talk with her. J.S. told her stepmother that Sierra had been sexually abusing her for a long time and that the abuse began when she was 8 or 9 years old. According to Skillett, Sierra would bring a washcloth and tell J.S. she needed to be cleaned. He then kissed J.S. "down there." Ac-

cording to J.S., she did not tell her mother because she was afraid her mother would hate her and also because she was afraid of Sierra. This was the end of the relationship between Skillett and Sierra, and the PFA action was filed soon thereafter.

At the hearing, J.S. testified, consistent with Skillett's testimony and the stepmother's testimony, that Sierra washed her with a washcloth and then licked her vaginal area.

L.S. also testified that on one occasion, Sierra took both J.S. and L.S. into the bedroom by themselves and closed the door. After they had bathed, Sierra took both of them into the bedrooms to check their private areas. She also testified that on one occasion, B.S. told her that Sierra licked her bottom.

At the trial, there was also testimony by a counselor who had interviewed the girls. The counselor testified that in her opinion, J.S. had been sexually abused by Sierra but she was unable to reach an opinion as to whether Sierra had sexually assaulted L.S.

Sierra testified at the hearing and admitted he did supervise the girls' bathing procedures but insisted that all he was doing was trying to be certain they were clean and their hygiene was attended to.

Based upon all the evidence, the trial court found that Sierra was guilty of a lewd touching of both J.S. and L.S. It believed the evidence to be insufficient as to whether Sierra had abused B.S. In any event, the trial court restrained Sierra from contacting Skillett, J.S., L.S., or B.S. It granted Skillett sole custody of B.S. and denied Sierra visitation with B.S. until he had submitted a plan for counseling, which would be approved by the trial court. This PFA order expired, by its own terms, on October 4, 2001.

After the PFA order had been filed, the parties filed a joint motion to consolidate the PFA action and the paternity case. The trial court granted the motion and, after the consolidation, Sierra appealed the PFA order. His appeal was dismissed as interlocutory as a result of the consolidation order.

After Sierra's appeal on the PFA case had been dismissed, the trial court proceeded to a hearing on the paternity, child support, and child custody issues. Sierra admitted he was B.S.'s father. The

parties and the trial court all agreed that the child support and custody issues had been bifurcated.

Both of these parties had high incomes. Sierra had income in 2000 of $156,402 as a result of his employment by a grain company. This company closed in early 2001, and at the time of closing, Sierra had earned $93,520. He then moved to Florida and was employed at a salary of $5,000 per month.

Skillett was unemployed at the time of trial. However, she had earned $137,458 per year in 1998 and 1999; $123,661 in 2000; and $179,066 from January through September 2001.

Both parties submitted child support worksheets. Skillett based her calculations on wages of $120,000 for herself and $150,000 for Sierra and asked for $964 per month in child support. Sierra's worksheet supported amounts from $289 to $442 a month. He submitted three worksheets. The trial court, in the paternity action, determined that Sierra was B.S.'s father, that Skillett was unemployed with no income, and that Sierra was earning $5,000 per month. The net child support obligation was $408, but the trial court deducted $121 for income tax consideration. The trial court then proceeded to add $313 for "overall financial conditions" and set Sierra's child support at $600 per month. The trial court indicated the $313 adjustment was made to increase Sierra's child support payments because Skillett "cannot immediately reduce her expenses from the level she had been able to maintain while she was working."

The trial court also awarded judgment to Skillett and against Sierra in the amount of $25,000 as reimbursement for the expenses of support and education of the child from the date of birth to the date of the order.

The custody and parenting plan orders from the PFA case were incorporated into the paternity case. This appeal is from the trial court's decisions in both cases.

## JURISDICTION

Our first question is whether we have jurisdiction to hear this appeal. Neither party raises the issue of jurisdiction, but we have the duty to raise it on our own initiative when it appears to be an

issue. *Hughs v. Valley State Bank*, 26 Kan. App. 2d 631, 633-34, 994 P.2d 1079 (1999), *rev. denied* 269 Kan. 932 (2000).

We have no question that the trial court's orders regarding child support and restitution are final orders. However, the custody and visitation hearing was bifurcated, and we have no record of a custody and visitation hearing. The question then is whether the court's orders of custody and visitation were final or interlocutory in nature.

At oral argument, the parties both urged us to conclude these were final orders and that this court has jurisdiction. We have examined the record in this case and reach that conclusion. Although there are factors which indicate the appeal is interlocutory, we are reminded that no visitation order is ever final, that the trial court always retains jurisdiction to modify those orders, and that the order in this case can be considered as final; thus, we do have jurisdiction.

## PROTECTION FROM ABUSE ACTION

In the PFA action, the trial court entered an order which prohibited Sierra from having any contact with B.S. On appeal, Sierra argues the trial court had no authority to do this because it did not find he sexually abused B.S. Skillett counters by arguing the issue is moot because the PFA order expired on October 4, 2001. We agree with Skillett's argument and conclude the PFA order is moot, and the appeal from it should be dismissed as moot.

The general rule in regard to the mootness doctrine is as follows:

"The general rule is that this court does not decide moot questions or render advisory opinions. The mootness doctrine is one of court policy which recognizes that it is the function of a judicial tribunal to determine real controversies relative to the legal rights of persons and properties which are actually involved in the particular case properly brought before it and to adjudicate those rights in such manner that the determination will be operative, final, and conclusive." *Board of Johnson County Comm'rs v. Duffy*, 259 Kan. 500, 504, 912 P.2d 716 (1996).

There are, however, exceptions to the general rule, and those exceptions involve vital rights to the parties. Mootness is not an issue of jurisdiction, and we have said that "the court will proceed to judgment whenever dismissal of an appeal adversely affects

rights vital to the parties, even where its judgment will not be enforceable because of lapse of time or other changed circumstances. [Citations omitted.]" *Gonzales v. State*, 11 Kan. App. 2d 70, 71, 713 P.2d 489 (1986).

Sierra argues this exception applies to him because the PFA order in this case will continue to affect his right to possess a firearm under Kansas and federal laws. He cites 18 U.S.C. § 922 (2000) and K.S.A. 2001 Supp. 60-3112.

K.S.A. 2001 Supp. 60-3112(a) provides that "orders . . . shall be entered into the national criminal information center protection order file." Orders which were entered into the national criminal information center (NCIC) file are cleared as an active record from the computer system when the order expires or has been dismissed by the court or has been invalidated by a court. K.S.A. 2001 Supp. 60-3112(b). The fact is, this statute no longer affects Sierra's rights because his name would have been removed from the active NCIC file on October 4, 2001, when the PFA order expired.

Federal statute 18 U.S.C. § 922 is also cited by Sierra although he does not state which of the numerous provisions applied to him. We assume he is concerned with 18 U.S.C. § 922(g)(8), which makes it unlawful for any person to have a firearm "who is subject to a court order" that restrains "such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." We believe Sierra should have no concern about this statute because insofar as the PFA order is concerned, he is no longer "subject to a court order."

We further note that procedurally a decision on the PFA order would not alter Sierra's rights under those statutes. We note that Sierra challenges only those orders regarding B.S. He has not appealed the findings or orders regarding Skillett, J.S., or L.S., and these orders are in and of themselves sufficient to apply 18 U.S.C. § 922 and K.S.A. 2001 Supp. 60-3112 against Sierra. However, as we said above, we do not believe the expired orders will implicate those statutes.

There is one more exception to the mootness doctrine and that is if the issue is "one capable of repetition and one of public importance." *Board of Johnson County Comm'rs v. Duffy*, 259 Kan. at 504. We do not believe that exception applies. Skillett and Sierra are no longer in any relationship, Sierra has moved to Florida, and any issues involving B.S. can be resolved in the paternity case. We have no explanation from Sierra as to why we should consider these facts to be of public interest.

" 'The phrase "public interest" as used in this connection means something more than that the individual members of the public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their individual rights or serve as a guide for their future conduct as individuals.' " *State ex rel. Stephan v. Johnson*, 248 Kan. 286, 290, 807 P.2d 664 (1991) (quoting Annot., 132 A.L.R. 1185, 1188-89).

We have considered the issue carefully and hold that any issues involving the PFA order are moot and will not be reached by this court. The appeal from the PFA action is dismissed as moot.

Our decision concerning the mootness of the order renders moot the issues raised by Sierra in his contention the trial court erred in prohibiting him from having contact with B.S.

## CUSTODY AND VISITATION

The trial court granted sole custody of B.S. to Skillett and denied Sierra any visitation with the child. He appeals that order, contending the trial court erred in this action.

We find no reason to reverse the trial court's order concerning custody. We admit it is a rare case in which we believe the trial court should deny visitation altogether with one of the contesting parents. However, we note that in this case, Sierra has been determined to have sexually molested Skillett's two other young daughters with whom he resided. There was some evidence that he sexually abused B.S., although the trial court failed to make such a finding. The counselor for the girls stated that in her opinion, it was not in B.S.'s best interests to allow Sierra supervised visitation until he began sex offender treatment. We agree. Although Sierra claims to want custody and visitation, he failed to submit any parenting plan or begin treatment, and we note he has not appealed

the finding that he sexually abused J.S. and L.S. To deny visitation rights to an individual who has sexually abused his daughter's half-sisters is not an abuse of discretion. We point out that should Sierra obtain sex offender treatment and submit a parenting plan, the trial court should consider those matters and reconsider the issue of custody and visitation at that time.

## PAST CHILD CARE EXPENSES

As stated earlier, the trial court awarded Skillett a judgment of $25,000 to reimburse her for what it believed Sierra's fair share of the child support would have been as computed from the date of the child's birth. Sierra argues the award was erroneous.

We disagree. There is statutory authority to support the trial court's action. K.S.A. 2001 Supp. 38-1121 provides:

"(c) Upon adjudging that a party is the parent of a minor child, the court shall make provision for support and education of the child including the necessary medical expenses incident to the birth of the child. The court may order the support and education expenses to be paid by either or both parents for the minor child. . . .

. . . .

"(e) In entering an original order for support of a child under this section, the court may award an additional judgment to reimburse the expenses of support and education of the child from the date of birth to the date the order is entered."

Sierra concedes the existence of the statutory authority but cites to us K.S.A. 2001 Supp. 60-1610(a) which allows such expenses only in exceptional circumstances. He argues the Chapter 60 statute should apply and not the section set forth from Chapter 38. In *State ex rel. Wingard v. Sill*, 223 Kan. 661, 663-64, 576 P.2d 620 (1978), the Supreme Court considered an argument similar to that made by Sierra in this case. In *Wingard*, the order was made under K.S.A. 38-1106 (Ensley 1981), and defendant in that case claimed that statute was unconstitutional because K.S.A. 60-1610(a) does not require fathers to pay medical expenses. The court rejected that argument by saying:

"The purpose of the paternity statute is to attempt to place the illegitimate child and its mother on par with the legitimate child and its mother. This court well knows that oftentimes the father of an illegitimate child disappears long before the child is born and makes no attempt to aid the mother until the judicial system

intervenes. Although the putative father may have a moral obligation to support the child, legal responsibility does not arise until paternity is adjudicated. On the other hand, the married father is usually not only present at the time of birth to aid the mother, but is also legally known to be the person responsible for the support and welfare of the child and at least jointly responsible for the mother's medical expenses. For this reason we find K.S.A. 38-1106 to be constitutional." 223 Kan. at 663-64.

Since that decision, K.S.A. 2001 Supp. 38-1121(e) now allows an unwed custodial parent to recover past expenses for the child's support and education from the noncustodial parent, not just birth expenses.

Sierra next argues the Kansas Child Support Guidelines (KCSG) are not applicable in a paternity action and the court can only award past expenses for actual expenditures that can be itemized and proven. Again, we disagree. K.S.A. 20-165 authorizes the Supreme Court to establish guidelines in any action under Chapter 38 or Chapter 60. The statutes in question deal with the determination of child support and make no distinction between paternity cases under Chapter 38 or child support cases under Chapter 60. Accordingly, we hold the KCSG apply to paternity cases as well as to cases arising under Chapter 60.

The KCSG determine the day-to-day expenses for the support of minor children:

"The purpose of child support is to provide for the needs of the child. The needs of the child are not limited to direct needs for food, clothing, school, and entertainment. Child support is also to be used to provide for housing, utilities, transportation, and other indirect expenses related to the day-to-day care and well-being of the child." Administrative Order No. 128, § II, A. (2001 Kan. Ct. R. Annot. 97-98).

We conclude the judgment entered by the district court is supported by substantial competent evidence, it was not unreasonable, and it is affirmed.

## CHILD SUPPORT PAYMENT

Finally, Sierra argues the trial court erred in increasing the child support from $313 to $600 per month.

In this case, the rebuttable presumption of reasonable child support under the KCSG was $408. Under section E, this amount was

decreased by $121 for income tax consideration, but it was then increased by $313 for the overall financial conditions of the parties. These increases and decreases made Sierra's child support $600 per month.

The question is whether the trial court had the authority to increase the child support by $313 because Skillett could not immediately reduce her expenses from the level she had maintained while employed.

We conclude this issue is controlled by *In re Marriage of Aubuchon*, 22 Kan. App. 2d 181, 183, 913 P.2d 221 (1996). In *Aubuchon*, the trial court increased the presumed child support amount by $100 per month because the mother had taken bankruptcy and had little debt while the father remained personally liable for some of the discharged debts. This court reversed the award of the trial court because it did not make any findings justifying the increased support as being in the best interests of the children. 22 Kan. App. 2d at 183. It appeared to us that the trial court was only devising a method to force the mother to reimburse the father for debts he will probably have to pay as a result of the mother's bankruptcy.

In this case, there is no finding and, under the KCSG, no justification for the $313 increase. It appears to us the trial court was attempting to force the father to reimburse the mother for her cost of living expenses which were not related to those of the child. We hold that under our decision in *Aubuchon*, this was error, and the child support order must be reversed and the matter remanded for redetermination of proper child support in accordance with the KCSG and this opinion.

In summary, we hold as follows:

(1)  All issues regarding the PFA order are dismissed as moot.
(2)  The order regarding an increase in the KCSG presumed child support amount is reversed and the matter remanded for a redetermination of the proper child support.
(3)  In all other aspects, the decision of the trial court is affirmed.

Appeal dismissed in part, affirmed in part, reversed in part, and remanded.