(78 P.3d 486)

No. 90,069

THE ASSOCIATED PRESS, THE KANSAS PRESS ASSOCIATION, THE KANSAS ASSOCIATION OF BROADCASTERS, THE CHANUTE TRIBUNE, THE GARDEN CITY TELEGRAM, THE HAYS DAILY NEWS, THE HUTCHINSON NEWS, LAWRENCE JOURNAL-WORLD, THE OTTAWA HERALD, PARSONS SUN, THE (PITTSBURG) MORNING SUN, THE SALINA JOURNAL, THE TOPEKA CAPITAL-JOURNAL, and THE WICHITA EAGLE, *Appellants/Cross-appellees*, v. KATHLEEN SEBELIUS and THE GOVERNOR ELECT TRANSITION OFFICE, *Appellees/Cross-appellants*.

Opinion filed October 31, 2003.

*Michael W. Merriam*, of Topeka, for appellants/cross-appellees.

*Steve Phillips*, assistant attorney general, for appellees/cross-appellants.

Before MALONE, P.J., GREENE, J., and LARSON, S.J.

*Per Curiam*: This is an action brought by The Associated Press, The Kansas Press Association, The Kansas Association of Broadcasters, and a group of Kansas newspapers (the Press) against Kathleen Sebelius, then incoming Governor of the State of Kansas, and an entity referred to by the parties as the Governor-Elect Transition Office (GETO). The Press claims Sebelius and GETO violated the Kansas Open Meetings Act (KOMA), K.S.A. 75-4317 *et seq.*, because Sebelius' Budget Efficiency Savings Team (BEST) conducted meetings without providing notice and opening them to the public. In district court, the Press sought a temporary restraining order and temporary injunction, as well as declaratory judgment. The district court denied all relief.

### Facts and procedural background

On November 5, 2002, Sebelius was elected Governor of Kansas and her election was subsequently certified by the Kansas Secre-

tary of State. On November 6, 2002, Sebelius began the creation of BEST by calling people whom she wanted to serve on the team. According to a press release, the purpose of BEST was to gather information and identify target areas on how to find efficiencies and savings in state government. BEST actually consisted of five groups, comprising a total of approximately 60 volunteers, with each group focusing on a separate area of state government. Group leaders were to report their preliminary findings to Sebelius at some point before her inauguration. Analysis, discussion, and recommendations based on those findings would be made in public meetings after her inauguration.

BEST leaders met for the first time on November 12, 2002. The separate groups began meeting thereafter on an informal basis. On November 18, 2002, John D. Hanna, on behalf of The Associated Press, requested notification of all BEST meetings in accordance with KOMA so that the press and the public might attend the meetings. This request was sent to Joyce Allegrucci, identified by the Press as a leader of the Sebelius transition team. On November 22, 2002, Sebelius' chief of staff, Kathy Greenlee, denied Hanna's request, maintaining BEST meetings did not fall under the requirements of KOMA.

On December 4, 2002, the Press filed a petition in Shawnee County District Court, alleging Sebelius and GETO violated KOMA by conducting BEST meetings without providing notice and opening them to the public. The Press sought a temporary restraining order, temporary injunction, and declaratory judgment. The defendants moved for dismissal of GETO as a party, arguing GETO was not a legal entity.

A hearing was conducted on December 12, 2002. The parties entered into the following stipulation of facts before the district court:

"(1) Kathleen Sebelius is Governor-Elect of the State of Kansas.

"(2) The Governor-Elect will be sworn into office on January 13, 2003.

"(3) Kathleen Sebelius is currently elected Kansas Commissioner of Insurance, an office she will hold until January 13, 2003.

"(4) Ms. Sebelius began creation of the Budget Efficiency Savings Team (BEST) on Nov. 6, 2002, by calling people she wanted to serve on BEST.

"(5) BEST team leaders met for the 1st time on Nov. 12, 2002. Team members had not all been selected at that point.

"(6) The purpose of BEST before Ms. Sebelius is sworn is to gather information and identify target areas on how to find efficiency and savings in state government. Team leaders will report their preliminary findings to Ms. Sebelius at some point before inauguration. Analysis, discussion, and recommendations based on those findings will be made in public meetings after her inauguration.

"(7) BEST has no decision making authority.

"(8) BEST is comprised of approximately 60 people, excluding state employees assigned as staff to BEST pursuant to K.S.A. 75-134. The 60 members have been divided into five groups: agriculture and natural resources, economy, human services, infrastructure, and public safety.

"(9) At Ms. Sebelius' request of Governor Graves, each BEST team has been assigned two or three state employees (12 total) who were assigned to the transition team by Governor Bill Graves pursuant to K.S.A. 75-134. They continue to receive their salary.

"(10) BEST team members receive no compensation or reimbursement for their time, mileage, or anything else, other than minor refreshments. (Lunches were paid out of private campaign funds.)

"(11) BEST teams have met on State property without payment to the State.

"(12) A majority of a quorum of the entire BEST membership has never met.

"(13) A majority of a quorum of members of individual BEST teams have met several times for the purpose of discussing the business and affairs of BEST. Two teams have met 3 times, and 3 teams have met 4 times.

"(14) A majority of a quorum of BEST teams have met in private for the purpose of discussing the business and affairs of BEST, declining to open its meetings to the public, stating that KOMA does not apply to BEST.

"(15) BEST has received requests for KOMA notice pursuant to K.S.A. 75-4318(b) from the news media. BEST has declined to provide such notice, stating that the KOMA does not apply to BEST.

"(16) An expressed intention for the teams not to meet before January 13 does not make the case moot.

"(17) The Governor-Elect has stated that she concedes that after her inauguration BEST falls under KOMA, and BEST will comply with KOMA openness and its notice requirements."

On January 6, 2003, the district court filed a memorandum decision and order denying the request for a temporary injunction, finding there was not a substantial likelihood the plaintiffs would prevail on the merits of the case. Specifically, the district court found that neither Sebelius, GETO, nor BEST were subject to KOMA. Accordingly, the district court also denied the requested

declaratory relief. The district court did not address the defendants' motion to dismiss GETO as a party.

Plaintiffs timely appeal the district court's denial of declaratory relief. Defendants timely cross-appeal the district court's refusal to dismiss GETO as a party to this action.

## Is the case moot?

Initially, we must address whether a case or controversy still exists between the parties. The question of mootness arises due to the parties' stipulation that after Sebelius' inauguration, BEST would be subject to and would operate in accordance with KOMA. In this regard, the Press acknowledges the request for injunctive relief is moot. However, the Press maintains the request for declaratory relief that GETO is a state agency subject to KOMA is an issue which remains ripe for determination.

Generally, appellate courts do not decide moot questions or render advisory opinions. *Skillett v. Sierra*, 30 Kan. App. 2d 1041, 1046, 53 P.3d 1234 (2002), *rev. denied* 275 Kan. 965 (2002). See *In re M.R.*, 272 Kan. 1335, 1339, 38 P.3d 694 (2002) (courts have duty to decide actual controversies by judgment which can be carried into effect and not to give opinions upon moot questions or abstract propositions). An appellate court will not dismiss an appeal as moot, however, unless it clearly and convincingly appears that the actual controversy has ended and the only judgment that could be entered would be ineffectual for any purpose and an idle act insofar as rights involved in the case are concerned.

Case law has developed an exception to the mootness doctrine which applies when an issue is both capable of repetition and one of public importance. *Skillett*, 30 Kan. App. 2d at 1048. In such cases, an appellate court may consider the merits of the issue despite it being moot under the circumstances. See, *e.g., Board of Johnson County Comm'rs v. Duffy*, 259 Kan. 500, 504-05, 912 P.2d 716 (1996) (considering merits of case even though issue became moot due to passage of time; issue was capable of repetition and was of statewide interest and public importance); *In re T.D.*, 27 Kan. App. 2d 331, 333-34, 3 P.3d 590, *rev. denied* 269 Kan. 933 (2000) (retaining appeal based on exception to mootness doctrine).

Here, this case is clearly moot as to Sebelius. However, we acknowledge that the case may be relevant to future incoming governors of Kansas. We find that the issue presented in this case is both capable of repetition and one of public importance. Accordingly, we will address the merits of the case.

### Issues and standard of review

The Press claims the district court erred in finding BEST meetings were not subject to KOMA. The Press argues: (1) GETO is an agency of the state within the meaning of K.S.A. 2002 Supp. 75-4318(a), and (2) both GETO and Sebelius are subject to KOMA in connection with BEST meetings.

Sebelius denies that GETO is an agency of the state within the meaning of KOMA. She also argues that the application of KOMA to GETO and BEST would violate executive privilege and the separation of powers doctrine. However, we find that the constitutional issues were not properly raised in district court. Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 650, 16 P.3d 962 (2001).

Resolution of this issue requires interpretation of KOMA; accordingly, this court's review is unlimited. See *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003) (interpretation of statute is question of law providing appellate court unlimited review).

"The fundamental rule of statutory construction to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. [Citation omitted.]" 275 Kan. at 305.

"Ordinary words are to be given their ordinary meaning, and a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. [Citation omitted.]" *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001).

Neither the public nor the press has a common-law right to attend meetings of governmental bodies; rather, such a right is

created by statute and is governed by the language employed therein. *State ex rel. Stephan v. Board of Seward County Comm'rs*, 254 Kan. 446, 447, 866 P.2d 1024 (1994). The policy of KOMA is stated as follows: "In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the policy of this state that meetings for the conduct of governmental affairs and the transaction of governmental business be open to the public." K.S.A. 2002 Supp. 75-4317(a). KOMA was enacted for the public benefit; therefore, it is construed broadly in favor of the public to give effect to its purpose. *Stephan*, 254 Kan. at 448.

KOMA identifies the types of meetings to which it applies. Subject to a few exceptions not relevant here,

"all meetings for the conduct of the affairs of, and the transaction of business by, all *legislative and administrative bodies and agencies of the state* and political and taxing subdivisions thereof, including boards, commissions, authorities, councils, committees, subcommittees *and other subordinate groups thereof*, receiving or expending and supported in whole or in part by public funds shall be open to the public and no binding action by such bodies shall be by secret ballot. *Meetings of task forces, advisory committees or subcommittees of advisory committees created pursuant to a governor's executive order* shall be open to the public in accordance with this act." (Emphasis added.) K.S.A. 2002 Supp. 75-4318(a).

Here, in order for BEST meetings to fall under the umbrella of KOMA, BEST must be either (1) a legislative or administrative body, an agency of the state, or a subordinate group thereof, or (2) a task force or an advisory committee created pursuant to a governor's executive order. See K.S.A. 2002 Supp. 75-4318(a).

The Press' sole position in this appeal is that GETO is an agency of the state within the meaning of K.S.A. 2002 Supp. 75-4318(a) and that BEST is a subordinate group of GETO. Thus, according to the Press, BEST meetings are subject to KOMA under the general coverage provision of the statute.

### Public funding requirement

Before we address whether GETO is an agency of the state within the meaning of KOMA, we recognize that another requirement for KOMA's application is that the agency of the state or subordinate group must receive or expend or be supported in

whole or in part by public funds. In this case, it appears that requirement is met. The stipulated facts indicate that BEST volunteers received no compensation or reimbursement for their time, mileage, or anything else, other than minor refreshments. However, there were 12 state employees assigned to BEST pursuant to K.S.A. 75-134. The state employees continued to receive their salary while assisting BEST. This evidence is sufficient to establish the public funding requirement of K.S.A. 2002 Supp. 75-4318(a). However, as the Press concedes, this factor alone does not decide the question of whether BEST meetings were subject to KOMA prior to the inauguration.

### What is GETO?

We return to our central question which is whether GETO is an agency of the state within the meaning of K.S.A. 2002 Supp. 75-4318(a). We must begin by asking a more fundamental question: What is GETO? GETO is derived from K.S.A. 75-134(a), which states:

"In preparing for the assumption of official duties as governor, each incoming governor who is not the governor currently in office, shall be provided necessary services and facilities, including:

(1) The use of office space, located on the first or second floor of the state capitol, appropriately equipped with furniture, furnishings, office machines and equipment, and office supplies as determined by the secretary of administration after consultation with the incoming governor;

(2) staff members, to be selected by the incoming governor, at rates of compensation determined by him or her within the limitations of appropriations therefor and paid therefrom by the director of the budget. Whenever requested by the incoming governor, any employee of any agency of the executive branch of the state government may be assigned to such staff on a reimbursable or nonreimbursable basis and while so assigned such employee shall be responsible only to the incoming governor for the performance of duties for which assigned. Any employee so assigned shall continue to receive the compensation provided by law for his or her regular employment, and shall retain the rights and privileges of such regular employment without interruption. Persons appointed as staff members under this subsection, other than those assigned from state agencies, shall be within the unclassified service;

(3) payment of expenses by the director of the budget within the limitations of appropriations therefor, for:

(i) services of experts and consultants;

(ii) travel expenses and subsistence allowances for persons serving without compensation;

(iii) mailing and telecommunications services; and

(iv) printing and binding services."

This provision is part of a group of statutes designed to promote the orderly transfer of executive power between governors. K.S.A. 75-134 provides the incoming governor with office space, furniture, office equipment, and staff members to assist with assuming the duties of office. K.S.A. 75-135 provides the same services for the outgoing governor to assist with leaving office. K.S.A. 75-137 authorizes the appropriation of funds necessary to carry out the purposes of the act but not to exceed $150,000. According to the evidence, these funds were divided equally between Sebelius and outgoing Governor Bill Graves.

K.S.A. 75-134 does not refer to the term "governor-elect transition office" or even the term "transition office." The statute only refers to services and facilities which are provided to an incoming governor. The statute authorizes state employees to be assigned as staff members for the incoming governor. This provision was utilized by Sebelius in creating BEST. It is interesting to note that the language of this provision states: "Persons appointed as staff members under this subsection, *other than those assigned from state agencies,* shall be within the unclassified service." (Emphasis added.) K.S.A. 75-134(a)(2). If the statute creates a state agency as the Press claims, it would seem that this language would read "other than those assigned from *other* state agencies."

### Is GETO a state agency?

Now that we understand the existence of GETO, as the term is used by the parties, we must decide whether it constitutes an agency of the state within the meaning of KOMA. Unfortunately, the term "agency of the state" is not defined by KOMA. Thus, we must refer to other authorities to attempt to ascertain a meaning.

The Press refers this court to two cases involving KOMA that may be of some guidance—not so much for their factual scenarios but for the concepts employed by the court when interpreting KOMA. In *State ex rel. Murray v. Palmgren,* 231 Kan. 524, 646

P.2d 1091 (1982), plaintiffs sought to recover civil penalties for an alleged violation of KOMA. The defendants were former county commissioners and hospital trustees who met in private to discuss matters relating to the hospital. The district court found defendants violated KOMA and, accordingly, assessed penalties against defendants. Defendants appealed, arguing, *inter alia*, KOMA was vague as to the governmental groups to which it applied. In addressing this issue in *Palmgren*, the Kansas Supreme Court recited a five-part test found in Smoot and Clothier, *Open Meetings Profile: The Prosecutor's View*, 20 Washburn L.J. 241 (1981), for determining what public bodies fall within the purview of KOMA. The test provides:

" 'First the group of people meeting together must be a "body or agency" within the meaning of the Act. Second, the group must have legislative or administrative powers or at least be legislative or administrative in its method of conduct. Third, the body must be part of a governmental entity at the state or local level, whether it is the governing body or some subordinate group. Fourth, it must receive or expend public funds or be a subordinate group of a body subject to the Act. Finally, it must be supported in whole or in part by public funds or be a subordinate group of a body which is so financed.' 20 Washburn L.J. at 256-57." 231 Kan. at 535.

Further, regarding the public funding requirement, the court stated as long as the parent body satisfies the public funding test, all subordinate groups are automatically covered by KOMA regardless of how they are funded. 231 Kan. at 535 (quoting Tacha, *The Kansas Open Meeting Act: Sunshine on the Sunflower State?* 25 Kan. L. Rev. 169, 186 [1977]). Applying the teachings of these articles to the facts of the case, the court noted the county board of commissioners received and expended public funds and found the hospital's board of trustees was a subordinate group of the county commission and was, therefore, subject to KOMA. 231 Kan. at 536. Ultimately, the court held KOMA was not unconstitutionally vague. 231 Kan. at 536.

In *Memorial Hospital Ass'n, Inc. v. Knutson*, 239 Kan. 663, 722 P.2d 1093 (1986), plaintiff, a not-for-profit corporation that ran the hospital, filed a declaratory judgment action to determine whether it was subject to KOMA. The hospital was owned by Riley County

and leased to the plaintiff by the Board of Trustees of Memorial Hospital. The district court found plaintiff was not subject to KOMA, and the attorney general appealed. After acknowledging the five-part test stated in *Palmgren*, the Kansas Supreme Court framed the central question as whether plaintiff, by receiving public funds that must be spent as directed by the Board of Trustees, was an administrative body or a subordinate group of an administrative body subject to KOMA.

The court explained that other courts have found two types of entities that are not subject to open meetings laws, regardless of the form the entities take: "(1) those which are merely advisory and have no decision-making authority, and (2) those which are basically independent entities which have some connection, by contract or other tie to a government entity, but are not actually created by some form of government action." 239 Kan. at 671. The court determined that although the Board of Trustees was an administrative body subject to KOMA, plaintiff was not advisory to either the county commission or the Board of Trustees and plaintiff had no decision-making authority to expend public funds. 239 Kan. at 672. Accordingly, the court affirmed the district court's finding that plaintiff was not subject to KOMA. 239 Kan. at 672.

Although *Palmgren* and *Knutson* provide some basic framework to interpret KOMA, neither decision defines the term "agency of the state" as used in K.S.A. 2002 Supp. 75-4318(a). Perhaps the most specific source addressing this issue is Kansas Attorney General Opinion 94-93. This opinion identifies four criteria in determining whether a body is an "agency" subject to KOMA:

(1) Does the group have the authority to make governmental decisions and act for the State?

(2) Does the group have independent authority in the exercise of its functions?

(3) Is the group subject to governmental audits or otherwise have its business procedures supervised?

(4) Does the group include corporate instrumentalities that accomplish public ends, both governmental and proprietary?

Att'y Gen. Op. 94-93, pp. 3-4.

Since the term "agency of the state" is not defined by KOMA, the district court adopted the definition under the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq*. K.S.A. 77-502(a) defines "state agency" to mean "any officer, department, bureau, division, board, authority, agency, commission or institution of this state . . . which is authorized by law to administer, enforce, or interpret any law of this state." Applying this definition, the district court noted that GETO is not even a statutorily recognized body. The district court also found that neither GETO nor BEST was authorized to "administer, enforce, or interpret any law of this state." The district court concluded that GETO had no decision-making authority which is implicit within the traditional meaning of state agency.

We agree with the district court that GETO does not appear to be a state agency as the term is generally defined by the legislature. As the district court noted, GETO is not even a statutorily recognized body. K.S.A. 75-134, the statute which "creates" GETO, is merely a funding statute. It provides the incoming governor with specified resources to be utilized at his or her discretion. The statute does not refer to the creation of a state agency, and it does not refer to any formal "transition office."

Although there is no single definition of the term "state agency," we find that any state agency, no matter how broadly defined, has two characteristics. First, the agency must be expressly created by statute. Second, the agency must be granted some express authority to act. Generally, state agencies administer, enforce, or interpret particular laws of the state, as authorized by the legislature. State agencies have decision-making authority and are not merely advisory groups.

The statutes are filled with examples of state agencies. K.S.A. 74-2433 *et seq*. establishes the Board of Tax Appeals as an independent agency within the executive branch of state government. The statutes further prescribe express powers and duties of the Board of Tax Appeals. K.S.A. 2-1904 establishes the State Conservation Commission as an agency of the state. The statute gives the agency authority to "perform such acts, hold such public hearings and adopt rules and regulations necessary for the execution of its

functions under this act." K.S.A. 2-1904(b). K.S.A. 75-2701 *et seq.* designates the State Historical Society as the state historic preservation agency. The statutes prescribe specific powers and duties of the agency. All these examples of state agencies are (1) expressly created by statute and (2) expressly authorized by the legislature to perform some acts or duties. GETO does not fit within this mold.

As if conceding that GETO is not a state agency in the traditional sense of the term, the Press argues that K.S.A. 2002 Supp. 75-4318(a) is not limited to agencies created by the legislature, but that it has a much broader meaning. The Press reminds the court that KOMA is to be liberally interpreted. According to the Press, a liberal interpretation of K.S.A. 2002 Supp. 75-4318(a) is to be inclusive, not exclusive, on the types of organized effort that can be called an agency. Essentially, the Press wants this court to equate the term "agency of the state" with "any group or organization." We understand that KOMA is to be construed broadly in favor of the public to give effect to its purpose. However, the Press is asking this court to construe the term "agency of the state" so broadly that it becomes meaningless. To adopt the Press' interpretation of this term requires a degree of creativity unwarranted by the statutory language and the evidence presented in this case.

We hold that the Governor-Elect Transition Office, as referred to by the parties in this case, is not an agency of the state within the meaning of K.S.A. 2002 Supp. 75-4318(a). Accordingly, GETO, to the extent that it is a separate entity, is not subject to the provisions of KOMA.

### Is BEST a subordinate group of GETO?

Even if GETO is construed as an agency of the state within the meaning of K.S.A. 2002 Supp. 75-4318(a), we do not believe the evidence supports the Press' argument that BEST is a "subordinate group" of GETO. We realize the district court reached this legal conclusion in its memorandum decision. However, the record is devoid of any evidence to show that GETO created BEST. Stipulation No. 4 provides that Sebelius created BEST by calling people she wanted to serve on the team. The team met and reported its findings back to Sebelius.

There is absolutely no connection in the record between GETO and BEST, except for the fact that certain staff members were assigned to BEST pursuant to K.S.A. 75-134. As indicated earlier, this factor is important in order to establish the public funding requirement of KOMA. However, this fact does not make BEST a "subordinate group" of GETO. Simply stated, BEST was formed by Sebelius individually, not GETO. Sebelius and GETO are not the same, especially if GETO assumes the status of a state agency, as the Press argues.

Thus, even if GETO is a state agency, the BEST meetings were not subject to KOMA as a "subordinate group" of GETO. BEST was created directly by Sebelius, and the Press concedes that KOMA does not apply to Sebelius as an individual. Therefore, KOMA can apply to BEST only if BEST itself is an agency of the state. However, the Press does not make this argument either.

### The 2001 amendment

For all the foregoing reasons, we conclude that KOMA does not apply to BEST under its general coverage provision. However, the statute was amended in 2001 to add a more specific provision of coverage. L. 2002, ch. 162, sec. 1. Pursuant to the amendment: "Meetings of task forces, advisory committees or subcommittees of advisory committees created pursuant to a governor's executive order shall be open to the public in accordance with this act." K.S.A. 2002 Supp. 75-4318(a).

According to testimony presented by the Press in district court, the 2001 amendment was offered in response to Governor Graves' establishment of a task force, which he called the "K-12 Education Financing for Results Task Force." The Graves' task force did not fall within the general provision of KOMA and, thus, elected to meet in private. With the passage of the 2001 amendment, KOMA was broadened to include groups, under the direction of the governor, that function in much the same capacity as BEST.

In district court, the Press argued that Sebelius was the functional equivalent of the governor and, accordingly, BEST meetings were subject to KOMA pursuant to the provisions of the 2001 amendment. The Press has abandoned this argument on appeal.

However, we will examine the 2001 amendment because we believe it provides further evidence that BEST meetings, prior to the inauguration, were not subject to KOMA.

Two important conclusions can be drawn from the 2001 amendment to K.S.A. 75-4318(a). First, the legislature did not believe that task forces or advisory committees created by a governor fall under the general coverage provision of KOMA as "legislative and administrative bodies and agencies of the state . . . and other subordinate groups thereof." Otherwise, the legislature would not have needed to amend the statute in 2001 for KOMA to specifically apply to such groups. There is a presumption that the legislature does not intend to enact useless or meaningless legislation. *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002).

Second, when the legislature amended KOMA in 2001 to include meetings of task forces and advisory committees, it only included such committees created pursuant to a *governor's* executive order. If it took an act of the legislature to make a *governor's* task force or advisory committee subject to KOMA, it follows that a task force or advisory committee created by an *incoming governor* is not subject to KOMA. As the Press now acknowledges, an incoming governor is not the same as the governor. For this court to broaden the scope of the 2001 amendment to include meetings of task forces and advisory committees created by an incoming governor would be creating law that clearly is not found within the statute. This is a function of the legislature, not the court. If it is the public's will that an incoming governor's task force or advisory committee should be subject to KOMA, this can be accomplished with a simple act of the legislature.

### Conclusion

We conclude as follows. First, the entity referred to by the parties as GETO is not an agency of the state within the meaning of K.S.A. 2002 Supp. 75-4318(a). Next, even if GETO would be a state agency, BEST was created by Sebelius individually and is not a subordinate group of GETO. Finally, the 2001 amendment to KOMA provides important evidence that KOMA does not apply to a task force or advisory committee created by an incoming gov-

ernor. For these reasons, we conclude the district court was correct in denying the requested declaratory relief. We decline to reach the cross-appeal.

Affirmed.